## KAUFMAN et al. v. MARQUETTE NAT. BANK et al.

(District Court, W. D. Michigan, N. D. December 28, 1922.)

Banks and banking ⬦246—Purchasers of bank's assets liable to stockholders for full value.

> Where, at expiration of charter of a national bank, the directors thereof transferred its assets, good will, and bank building to a new national bank organized by them, pursuant to a plan or scheme kept secret from plaintiffs, minority stockholders, paying full value for all assets, except the bank building and lot and the good will, the bank building being undervalued and nothing at all paid for good will, *held* in plaintiff's suit against the new bank and the directors of the old bank, that defendants would be compelled to pay full value for both these items to the stockholders pro rata of the old bank.

In Equity. Suit by Louis G. Kaufman and others against the Marquette National Bank and others. Decree for plaintiffs.

Miller, Eldredge & Eldredge, of Marquette, Mich., Beekman, Menken & Griscom, of New York City, and W. T. Potter, of Ishpeming, for plaintiffs.

M. J. Sherwood, of Marquette, Mich., Allen F. Rees, of Houghton, Mich., and L. E. Garvin, of Marquette, Mich., for defendants.

SESSIONS, District Judge. The facts essential to the decision of this case, except as to property values, are not in dispute, and an extended or detailed recital thereof would serve no good purpose A brief summary of the salient features of the transaction involved in this controversy will suffice:

The charter of the Marquette National Bank expired at the close of the 6th day of October, 1921. At that time its deposits amounted to upwards of $2,100,000. Its loans and bills discounted and other investments were correspondingly large and of an unusually high grade. It was very prosperous, its net earnings amounting to upwards of $40,000 per annum. Its capital was $100,000, its surplus $100,000 and its undivided earnings approximately $27,000; thus making the book value of its shares about $227 per share. The actual market value of such shares was approximately $300 per share. For more than a year before the expiration of the bank's charter, the individual defendants, who constituted its entire board of directors, acting in their official capacity as officers and directors of the bank, had been seeking to devise some plan or scheme whereby plaintiffs and those represented by them might be eliminated as shareholders and, at the same time, the business of the bank continued without interruption or loss. To this end, committees of their own number made trips to Washington, Cleveland, Chicago, and other cities, partly, at least, at the expense of the bank, and there was also an extended correspondence with bankers and bankers' agents located in different places. Two plans were suggested, discussed and considered; the one to renew and to extend the charter of the bank, possibly with a change of name, and the other to organize a new bank. The latter plan was finally selected and adopted early in August, 1921.

During August and September and the first six days of October, this plan was secretly, but actively and successfully, carried out and executed. The defendant Union National Bank was organized and incorporated, with a capital of $100,000 and a surplus of $100,000. All of the stock in the new bank was subscribed for and taken by the individual defendants, who became its directors. For appearance sake, two of the individual defendants, who had not been directors of the old bank, became directors of the new. Formal meetings of the boards of directors of the old and new banks were held at the same time and place, and resolutions were adopted authorizing and directing the sale and transfer to the new bank of the business and all of the assets and property of the old bank, except a small amount of slow and doubtful bills and notes receivable. Written conveyances were made accordingly. No meetings of stockholders were called or held, and no notice of what was transpiring was given to plaintiffs or their sister, Mrs. Hudson. As to them, the entire transaction was conducted with the utmost secrecy.

The consideration paid by the Union National Bank to the Marquette National Bank for the latter's business, assets, and property was $75,000 for the bank building, fixtures, and real estate, $5,000 for bank furniture, the assumption by the Union National Bank of the liabilities of the Marquette National Bank to its depositors and other creditors, and a balance in cash. Tangible assets, other than the bank building, furniture, fixtures, and lot, were taken at their face value. Nothing was paid for the "good will" of the Marquette National Bank. Plaintiffs concede that full value was paid for the assets and property so sold and transferred, except as to two items—the bank building, together with the lot upon which it is located, and the "good will" appertaining and belonging to the business.

1. *Value of Bank Building, Fixtures, and Lot.*—Plaintiffs contend that, at the time of the transfer on the 6th day of October, 1921, the fair value of the bank building and lot was approximately $150,000. Defendants claim that the $75,000 paid therefor was all that the property was worth. Plaintiffs' witnesses, except one called in rebuttal, based their estimates of value upon the cost of reproducing the building plus the value of the land; while defendants' witnesses arrived at their valuations by capitalizing the net rental income upon a 6 per cent. basis. It is obvious that, in determining the value of the property, both of these theories must be considered, and neither can be adopted to the exclusion of the other. The building, in both its old and new parts, has been kept in good repair, and is constructed of such materials that little depreciation has occurred. It is thoroughly equipped for and adapted to its use as a banking office. The rental theory entirely ignores the value of that part of the lot fronting on Washington street, which is not covered by the building and can be used for other purposes. The location, while not as good as that diagonally across the streets, is, for banking purposes, one of the best in the city of Marquette. Defendants' witnesses assumed that a fair rent for that part of the building occupied by the bank itself would be $300 per month, including heat and janitor service. It is certain that such

assumed rental is at least $100 per month too small. This building was constructed and designed for and is used as a banking house. Its value cannot be determined alone by the income which might be obtained from its use for other commercial purposes.

On the 6th day of October, 1921, before the Union National Bank took formal possession, one of the plaintiffs made a written offer of $150,000 in cash for the property, coupled with an agreement to permit the Marquette National Bank to occupy the bank offices, rent free, during the period required for the liquidation of its assets. This offer was rejected by defendants, for no other apparent reason than that its acceptance would have interfered with their plan to take the property for themselves. At the hearing of this case and during his cross-examination by defendants' counsel, the same plaintiff offered to pay $100,000 for this property. The last offer still holds good. While these offers are not conclusive and controlling, because they may have been induced by motives having little or no relation to actual values, still they are entitled to consideration and weight in determining the price which defendants ought to have paid for the property. A careful review and examination of the evidence upon this subject compels the conclusion that the bank building, fixtures, and lot, which were conveyed to the Union National Bank for the sum of $75,000, were fairly worth, at the time of such conveyance, at least the sum of $100,000.

2. *Good Will.*—However difficult it may be to define accurately and to determine with exactness what is included in the "good will" ordinarily incident to the sale and purchase of a business, in the situation and under the conditions presented by this record, it cannot be successfully denied that the "good will" of the business of the Marquette National Bank which was appropriated by the other defendants was of large value. It is idle to contend that a successful and prosperous banking business of 20 years' growth, possessing and enjoying the full confidence of its patrons and the general public, housed in suitable and well-equipped banking offices in a choice location, having deposits of upwards of $2,000,000, all invested in gilt-edge securities bearing a high rate of interest, earning from 15 to 20 per cent. per annum upon the capital invested therein, and paying large dividends to its stockholders, has no "good will" which it can sell and convey to the purchaser of all of its assets and property. Indeed, it is conceded that the Union National Bank by its purchase derived large benefits of substantial value over and above the consideration paid for the tangible assets and property of the Marquette National Bank. But defendants advance the anomalous contention that, although, in the purchase and sale of the bank property and business, the purchaser could and did acquire a valuable asset of "good will," yet the seller had no "good will" of value to sell.

The argument to sustain this contention is two-fold: First; that the "good will" connected with the business of the Marquette National Bank, if any existed, was not owned by the bank, but pertained and attached to the management, and belonged to the managers, and could be held or disposed of by them for their own personal advantage and benefit; second, that upon the expiration of the bank's charter its busi-

ness as a banking institution ceased to exist, and hence that all "good will" incidental thereto also ceased to exist. The fallacy of the argument lies in the fact that neither premise is true. In this case the managers of the business were either the agents or the trustees of the bank and its stockholders, and everything of value resulting from their services and efforts as such agents or trustees belonged, not to them individually, but to their principals or cestuis que trustent, the bank and its owners. The insistence that the business of the Marquette National Bank ceased to exist upon the expiration of the bank's charter is likewise without merit. In fact, through the manipulation and management of the individual defendants, the business of the Marquette National Bank was appropriated and continued, without the slightest interruption or loss, in every respect and detail, except the change of name, and even such change was so cleverly and adroitly managed, represented, and advertised that neither the general public nor the patrons and customers of the bank realized that it was anything more than a technical legal requirement connected with the renewal of the bank's charter. In this manner, the Union National Bank, without effort or expense on its part, was enabled to open its doors on the morning of the first day of its active existence in possession of a highly prosperous and successful business of 20 years' growth and standing. Having thus appropriated and converted to their own use the "good will" of the Marquette National Bank, so created and built up by and through a large expenditure of time and money, defendants cannot escape liability for the full value thereof, if such value can be ascertained and determined.

The success, earnings, and profits of a bank depend almost wholly upon its deposits. Hence the size and amount of such deposits furnish a fairly accurate index to and measure of the value of the "good will" which goes with a sale and transfer of its business to another bank. The testimony of the witnesses in this case upon the question of the value of a bank's "good will," as measured by and based upon the amount of its deposits is widely divergent, ranging from a maximum of 5 per cent. to 8 per cent. of such deposits in banks located in large cities like New York and Chicago, to a minimum of 1 per cent. or 2 per cent. of the deposits in banks located in small cities like Marquette. Without discussing the testimony in detail, we may safely conclude that, computed upon this basis, the fair value of the "good will" of the Marquette National Bank transferred to and acquired by the Union National Bank was 3½ per cent. of the deposits so obtained and retained by the latter bank, or the sum of $73,780.

Again, if the difference between the book value and the market value of the shares of the bank's capital stock immediately prior to the sale and transfer be accepted and applied as a measure of value of "good will," substantially the same result will be obtained. If the question be considered from the standpoint of earnings, or of expense in obtaining deposits, a substantially different result does not follow.

3. *Union National Bank.*—In the organization of the Union National Bank, legal requirements and formalities were complied with; but the bank was conceived and created for the sole purpose of getting rid

of the plaintiffs and those whom they represented, and, for the accomplishment of such purpose, became merely the creature or instrumentality of the individual defendants, who had subscribed for and, at the time of the transactions here under consideration, were the owners of all its capital stock, and also, by their own appointment, were its directors and officers. The natural, economical, and straightforward course to have been pursued was to renew the charter of the Marquette National Bank; but they, as agents or trustees of the old bank and its stockholders, chose rather to deal directly with themselves and for their own private benefit with reference to the trust property in their hands and under their control, and their actions and conduct must be judged accordingly.

4. *Directors and Officers of the Marquette National Bank.*—Whether the directors of a bank be called agents, trustees, or quasi trustees is of little importance. Whatever their designation, their relation to the bank and to all of its stockholders, both minority and majority, is fiduciary in character and one of confidence and trust. Neither agents nor trustees, as such, will be permitted to deal with the property in their possession and under their control for their own personal benefit or profit. It was the duty of the directors of the Marquette National Bank actively to protect and to preserve the property placed in their hands by the stockholders, and the secret sale and transfer of such property to themselves, without the knowledge and consent of all the stockholders, was such a violation of duty and breach of trust as to require a court of equity, upon the timely application of interested parties, to set aside and hold for naught the entire transaction. This is especially true, in view of the fact that the consideration paid was inadequate. It may well be doubted that these directors, for their own profit, benefit, and advantage, could lawfully keep silent as to the impending expiration of the bank's charter; but, be that as it may, the termination of the existence of the bank furnished no justification for their conduct. They continued to be directors after the expiration of the charter the same as before, and their fiduciary duties and obligations were of the same nature and character. In fact, however, the sale and transfer of the old bank's assets and property to the new bank were consummated and completed before the expiration of the charter of the old bank. The final plan and scheme had been perfected and adopted as early as the first week in August, 1921, and from that time forward their efforts were directed solely to the execution of such scheme. The business of the bank was continued in usual course, without hint of the contemplated change of ownership. The necessary resolutions and instruments of conveyance were prepared, and all that remained to be done upon the 6th day of October, 1921, was the merely formal adoption of such resolutions and the prearranged execution of the deeds of conveyance. It thus appears that, with the exception of a small amount of bills and notes receivable, of doubtful value, the liquidation of the business and assets of the Marquette National Bank was actually and fully accomplished before its charter expired.

This entire transaction, from its inception to its conclusion, was carefully concealed. No meeting of stockholders was called. No vote

was taken. No opportunity was given to these plaintiffs to express their wishes or to exert their influence. Such secrecy was, in itself, a badge of fraud, and raises a strong presumption that these defendants then believed and knew that their conduct would not bear that close scrutiny to which they now concede it must be subjected. To admit, as they do, their fear that a disclosure of their plans to those entitled to such disclosure might result in interference therewith by legal proceedings, is to confess their guilt of wrongdoing.

5. *Relief.*—As a part of the transaction here under consideration, the Union National Bank was appointed liquidating agent of the Marquette National Bank and its property, and, as such agent, immediately declared and paid a dividend of $200 per share to all the stockholders of the old bank, except plaintiffs and their sister, Mrs. Miriam B. Hudson, to whom the same dividend was tendered, but refused, because of their insistence that the whole transaction was fraudulent, and because of their belief that the acceptance of such dividend would prejudice their rights. Their refusal to accept the money so tendered was fully justified. The Union National Bank should now be required to pay to plaintiffs and Mrs. Hudson such dividend of $200 per share of stock held by them respectively, and, having had the possession and use of such moneys, should also be required to pay interest thereon at the rate of 5 per cent. per annum from the 17th day of October, 1921, to the date of such payment. In its accounting as liquidating agent, it will be credited with the amount of principal so paid, but not with the interest.

The ultimate rights of plaintiffs are neither greater nor different in nature and character from those of the other stockholders in the Marquette National Bank, each of whom will share proportionately in the moneys or property recovered in this suit. Hence the determination of what is for the best interests of the bank is of paramount importance. The bank as a banking institution closed its doors more than a year ago. Practically all of its assets and property have been appropriated and converted, and, with the exception of the bank building, lot, furniture, and fixtures and a negligible amount of bills and notes receivable, cannot be restored. Obviously, with respect to the "good will" so appropriated without consideration, a money decree for its value is the only relief which can be awarded. It also seems apparent that to set aside the transfer and conveyance of the bank building, lot, furniture, and fixtures would result merely in an additional expense of resale and would serve no good purpose. The bank and its stockholders have no further use for this property, except to realize the best price possible upon its sale in the process of liquidation. A resale of the property and an accounting concerning the rents, income, and upkeep of the building would involve unnecessary expense. The repayment of that part of the purchase price already paid would be both burdensome and inconvenient. There is little probability that this property, if now offered for sale to the highest bidder, would bring more than $100,000. The Union National Bank and the individual defendants, having misappropriated and wrongfully converted this property to their own use, cannot be heard to complain if they are compelled to pay the full value thereof.

6. *The Decree.*—A decree may be prepared in usual form and containing the following provisions:

(1) Finding and declaring the sale and transfer of the assets and property of the Marquette National Bank to the Union National Bank to have been fraudulent and voidable.

(2) Ordering, directing, and requiring the Union National Bank forthwith to pay to plaintiffs and Mrs. Miriam B. Hudson $200 per share of stock in the Marquette National Bank held by them, respectively, together with interest thereon at the rate of 5 per cent. per annum from the 17th day of October, 1921, to the date of payment.

(3) Appointing a receiver for the Marquette National Bank, to take charge of its remaining assets and to continue and complete the liquidation of such bank and its business and assets.

(4) Setting aside the appointment of the Union National Bank, as liquidating agent of the Marquette National Bank, and requiring the Union National Bank to render an account of its doings, and of all moneys and property which have come into its hands as such liquidating agent, and to pay and turn over to the receiver of the Marquette National Bank all moneys and property now in its possession or under its control and belonging to the Marquette National Bank.

(5) Ordering, directing, and requiring the individual defendants and the Union National Bank forthwith to pay to such receiver the additional sum of $25,000 for the bank building, lot, furniture, and fixtures, and the sum of $73,780 for the "good will" of the Marquette National Bank and its business, or a total amount of $98,780, together with interest thereon at the rate of 5 per cent. per annum from the 6th day of October, 1921, to the date of the decree herein.

Plaintiffs will recover their costs of suit, to be taxed against the Union National Bank and the individual defendants.