**CONNOLLY (MOORE et al., Interveners) v. COMMERCIAL NAT. BANK IN SHREVEPORT.**

Civil Action No. 83.

District Court, W. D. Louisiana, Shreveport Division.

Sept. 3, 1947.

Monroe & Lemann, of New Orleans, La., and Foster, Hall & Smith, of Shreveport, La., for plaintiff.

Lee & Lee, Cook, Cook & Egan, and Herold, Cousin & Herold, all of ' re-port, La., and E. B. Stroud, of Dallas, Tex., for defendant.

Plauche & Plauche, of Lake Charles, La., and Bullock & Bullock, of Shreveport, La., for intervenors.

DAWKINS, District Judge.

The prior record of this case is to be found in Leslie v. Commercial Nat. Bank, 28 F.Supp. 927; Rawlings v. Commercial Nat. Bank, 44 F.Supp. 5; and Parsons v. Commercial Nat. Bank, 64 F.Supp. 888 (opinions by this court) and in Commercial Nat. Bank v. Parsons, 5 Cir., 144 F.2d 231, and Id., 145 F.2d 191 (opinions by the Court of Appeals for this circuit).

When it came back from the Court of Appeals, defendant sought to amend its answer by alleging that the six per cent on daily balances, stipulated in the contract, was in reality compensation for services in administering and liquidating "Class B" assets; and that it, the new bank, was the unconditional owner of all "Class B" assets, instead of pledges, so that any saving upon taxes became its property. This amendment was denied, but defendant was permitted to amend for the purpose of claiming compensation on a quantum meruit as to Class "B" assets, for the reasons stated in D.C., 64 F.Supp. 888. Later defendant moved for summary judgment based upon a mass of evidence taken by deposition, in anticipation of the allowance of the amendment. This court held that, under its interpretation of the two opinions of the Court of Appeals, originally and on rehearing, it could do no more than determine the balance due the old bank after hearing the evidence and fixing the compensation due for services rendered and expenses in liquidating both "B" and "C" assets. There was also the question of whether defendant was guilty of bad faith in handling the old bank's affairs.

These issues opened a very wide field for the introduction of evidence. Accordingly, defendant sought to introduce evidence in support of all its contentions, as if its attempted amendment had been allowed, and has argued them both orally and in brief, including the validity and enforceability of the provision for six per cent interest on daily balances, and its right to the tax savings on real estate, both of which this court thought had been eliminated on the last appeal. Notwithstanding the views expressed in the opinions denying the amendment and upon the motion for summary judgment, repeated on several occasions in the course of the second trial, this court has patiently listened to and examined the voluminous evidence and record as well as the briefs in support of those contentions. Nevertheless, it is still of the opinion that its only duties are, to first determine whether the defendant has been guilty of bad faith and if not, the amounts due it for the administration and liquidation of both classes of assets.

Certain facts are either not denied or can not be seriously disputed, to-wit:

Randle T. Moore was the chairman of the board of directors and Ben Johnson had been president of the old bank for some years prior to December 1932. They were the executive heads and managers of its affairs, assisted by some other officers and thirty odd members of the board.

964

While it had paid dividends of approximately one per cent a month over a considerable period of time, large sums, under instructions of bank examiners and the Comptroller of the Currency, had been charged off, and an ever increasing amount of slow and doubtful assets had been accumulating.

In the meantime the depression, which followed the crash in the fall of 1929, gradually spread throughout the world, with serious consequences, not only in this institution but to the whole banking and financial structure of the country. Only those banks whose management had the foresight to see and provide against what followed the wild speculation that went on in the United States in the late twenties were saved from embarrassment by the financial crisis which culminated in the banking holiday in early March 1933.

Among national bank examiners who had examined the affairs of the old bank was one Jacob Embry. R. T. Moore and V. Murrell, during the summer of 1932, after the departure of Johnson, had agreed to obtain the services of some one experienced in banking to join the force of the old bank, for the purpose of assisting in the liquidation of obligations in its port-folio. They finally centered on Embry. Moore was not successful in his efforts to induce Embry to join the staff of the old bank, but, after a personal appeal from Murrell, followed by a visit to Shreveport from Dallas, Embry was induced to accept, but on condition that he be permitted to "write his own ticket," and at a salary of $12,000. His employment began in *August of 1932,* after having resigned as a national bank examiner. He unquestionably had much familiarity with the affairs of the old bank as the result of his audits, one of which had taken place earlier in 1932.

On *November 14th* of that year, national bank examiner Sandlin began an audit of the affairs of the old bank. After some days, he went to Moore, chairman of the board, with figures which showed it to be in bad shape, to such extent that the latter became incensed and used language which caused Sandlin to abandon further attempts to discuss matters with him. On Thanksgiving Night, November 24, 1932, Sandlin arranged a meeting with certain of the directors, at which he reported the condition of the bank as being so serious as to warrant action by the Comptroller, if something were not done to repair the capital structure. With this development, Murrell appears to have taken the initiative. It can not be denied, that if Sandlin was correct in his representations as to the old bank's condition, the situation was extremely delicate, if not actually dangerous, especially in view of the rapidly developing picture nationally with respect to all banks. Some of the officers and directors, apparently led by Murrell, called a meeting of the most responsible, financially, directors and stockholders of the old bank, at the Washington-Youree Hotel, at which the condition as found by Sandlin, was reported, and for which the latter had suggested three alternatives: (1) Of assessing stockholders, (2) the taking of the bad paper out of the bank by the officers and directors, and (3) the organization of a new bank. He advised the last. It is hardly necessary to say that this situation required the greatest care in keeping it from the public. The meeting at the hotel continued for a part at least of two days. No one seems to have seriously attempted to promote any of the alternatives other than creation of a new bank, and Murrell was the most active figure in getting subscriptions to its capital, the major portion, if not all, of which was promised on those two days. Among those who had tentatively subscribed was Embry for the sum of $100,000 or 1/10 of the new capital. However, he asked for time to further consider it and returned to Dallas, Texas, over the weekend. On coming back to Shreveport the early part of the following week, he informed the others that he had decided not to participate. It therefore became necessary to make up this $100,000 to complete the capitalization of $1,000,000 (consisting of 10,000 shares of the par value of $100 each) and a meeting was arranged at a country camp owned by one of the old bank's directors, S. D. Hunter. There the additional subscriptions were supplied

and steps were later taken that culminated on the succeeding Saturday, December 3d, 1932, in the contract by which the new bank was to take over and liquidate the affairs of the old bank. Those who subscribed to the stock and organized the new bank were all directors, and some officers of the old bank.

Those organizing and controlling the new bank insisted upon Embry remaining. This he did and became executive vice-president of the new bank. He also promptly became one of the principal actors in the events which took place on December 3, 1932 and thereafter. He drafted the contract between the two banks, using as models those by which two other bank reorganizations had been accomplished in the city of Shreveport within a comparatively short period preceding.

Funds to provide capital for the new bank were raised in the following manner:

The Commercial National Company was a wholly owned subsidiary of the old bank. S. D. Hunter, or the Ouachita Securities Corporation, controlled by him, held a note of the Commercial National Company for the sum of $300,000, which bore interest at the rate of 5½ per cent, and was secured by the pledge of some 2800 shares of the capital stock of the Continental American Bank & Trust Co. This note was purchased on December 3, 1932, contemporaneously with the contract between the two banks, by the old bank for $300,000 in cash, $225,000 of which Hunter used to pay for 2250 shares of stock in the new bank. Murrell, trustee, paid for 490 shares of the new stock with a check for $49,000 drawn by the Continental American Bank & Trust Co., upon, and which consumed the balance of its deposit account with the old bank. Wheeless paid for 150 shares or $15,000 of his $65,000 subscription (650 shares) with a check upon his account with the old bank. George D. Wray paid for the whole of his subscription of 600 shares or $60,000 by check upon his account with the old bank. Jacob Embry paid for 10 shares or $1,000 by check on the old bank. E. T. Robinson gave his check on the old bank for his entire subscription of 1150 shares or $115,000 and C. N. Minor paid for his 500 shares of the par value of $50,000, with check on the old bank but only after depositing $40,000 therein, from another source. Thus, the total amount paid for by check on accounts in the old bank was $250,000, to which should be added $225,000 of the old bank's funds paid to Hunter and used to buy stock.

From sources other than either bank there were supplied funds, as follows: Frank D. Lee 650 shares or $65,000; N. H. Wheeless 500 shares, $50,000; Sam Wiener 600 shares, $60,000; and C. R. Minor 400 shares, $40,000. To recapitulate, funds of the old bank were used to pay for stock in the new bank as follows:

| | shares | | $ |
|---|---|---|---|
| Hunter | 2250 | shares | $ 225,000 |
| Murrell, trustee, | 490 | " | 49,000 |
| Wheeless | 150 | " | 15,000 |
| Wray | 600 | " | 60,000 |
| Embry | 10 | " | 1,000 |
| Robinson | 1150 | " | 115,000 |
| Minor | 100 | " | 10,000 |
| Totals | 4750 | " | 475,000 |
| Stock pd. for with proceeds of loans from funds of old bank | 3100 | " | 310,000 |
| Total funds of old bk. used for providing capital for new bank | | | 785,000 |
| Stock pd. for from sources other than either bank | 2150 | " | 215,000 |
| Totals | 10000 | | $1,000,000 |

In addition, Hunter got $75,000 of the old bank's money in cash from the sale of the note of the Commercial National Company, thus making a grand total withdrawn from the cash of the old bank in the process of reorganizing the new, of $860,000; and leaving a net of $140,000 of new money that went into the capital structure of the new bank, in the beginnings, until the $310,000 borrowed from the old bank had been paid. In other words, the new bank began business on December 5th, 1932, with a net improvement of its cash position of $140,000 plus notes for the loans and the new stockholders' statutory liability for the amount of the capital stock of $1,000,000. As against this, it took over all the assets of the old bank under the terms of the contract of December 3, 1932, and assumed its liabilities, other than to the stockholders of the old bank for their subscriptions to its

stock. The assets taken over and classified at the beginning of the liquidation were as follows:

| | | |
|---|---|---|
| Class "A" (taken as cash or its equivalent) | | $ 3,511,438.78 |
| Class "B" | | 9,910,221.60 |
| The liabilities assumed by the new bank were as follows: | | |
| Deposits | $12,124,323.95 | |
| Circulation | 1,000,000.00 | |
| Bills rediscounted with Federal Reserve Bank | 212,000.00 | |
| U. S. Government tax | 142.54 | |
| Reserve for interest | 18,677.48 | |
| Reserve for taxes | 63,168.11 | |
| Reserve for sundry expense | 3,348.30 | |
| | 13,421,660.38 | 13,421,660.38 |

All other assets were placed in Class "C" and did not appear on the general ledger. In the new bank F. D. Lee became chairman of the board of directors and Murrell president with Jacob Embry as executive vice-president. In its dealings with the public, including depositors, the business continued as before, in the same bank building, with the same bank fixtures and equipment, clerical and operating employees.

Deposits declined during the first half of 1933 to between $8,000,000 and $9,000,-000, but thereafter, increased and were eventually built up to some $20,000,000 during the period of administration of "B" assets, which had been completed in full by May, 1937, or about four and a half years. For an analysis of deposits see footnote.[1]

During the year 1932, from January to November 14th, cash on hand and with correspondents increased by $1,335,076; loans and discounts decreased $3,034,394.-84.

From November 14, 1932, to December 3d, 1932, the Continental American Bank & Trust Co., of which Murrell was president, withdrew from its deposit account with the old bank the sum of $539,204.29, leaving only $49,000, which was used on the last mentioned date by Murrell in paying for the same amount of stock in the new bank, which he had subscribed as trustee, and thereby closed the account. There is no explanation as to why these withdrawals were made by one bank of which Murrell was the executive head from another in which he appears to have been so vitally interested, within less than three weeks. He, of course, was aware of the report and contention of Sandlin as to the old bank's affairs. Ordinarily, when a bank finds itself in the condition of the old bank, other banks and large depositors who are officers and directors of the bank in trouble, unless they feel the situation is very bad, or wish to take some advantage, frequently add to deposits and discourage withdrawals by others.

Had the new bank been organized with a capital of $1,000,000 without any relation to the old bank, it was proven by witnesses of the defendant, that normally, some years would have elapsed before it could have built up deposits of as much as $10,000,000; and consequently, several years to begin paying dividends on its stock from earnings. On the other hand, in this case, due mainly to the charge of six per cent on daily balances, plus other income made available from activities in other departments of the bank, which were possible because of the fact that it was a large going concern, there was a net profit from De-

---

[1] From May 1, 1931, to December 31 of that year, there was a gradual decline of deposits from $20,483.86 to $15,-564,450.26, or approximately $5,000,-000; from January 31, 1932, to November 14, 1932, there was a further decline from $15,453,676.33 to $13,145,-578.39, or roughly $2,300,000; and from November 14th to December 3d (date of closing of old bank or about 19 days) there was a decline from $13,145,578.39 to $12,124,323.95 or a little more than $1,000,000.

When the new bank opened for business on December 5, 1932, it had deposits of $11,979,913.42, which had dropped by the date of the banking holiday, March 5, 1933, to $9,269,037.21, or approximately $2,700,000. It reopened for business on March 13, 1943, with deposits of $8,961,804.20 or an additional loss of some $300,000 in deposits. Thereafter, deposits hovered between $8,000,-000 and $9,000,000, the lowest being $8,-739,000, on April 12th, until June 1933. In other words, by April 12, 1933, there had been paid out to depositors the sum of $3,285,255.56, in excess of new deposits, which lacked only $226,183.22 equaling the total amount of Class "A" assets taken over as cash or its equivalent under the contract. In June the deposits began to increase and continued to do so thereafter.

cember 3, 1932, to December 31, 1940, of $1,195,480.47, or some 119% on the capital, or at the rate of approximately 17% per annum.

The purchase of the note of Commercial National Company from S. D. Hunter for $300,000 cash by the old bank, $225,000 of which was used in purchasing stock in the new bank, the loans to other officers and directors of some $310,000 with which to purchase stock, and the use of some $475,000 of the old bank's cash through checks on their deposit accounts by other officers and directors to purchase the new stock, were not authorized by the board of directors, but were handled by those involved, as if the old bank was still a going concern and would again open on December 5, 1932, and was without the knowledge of other officers and directors of the old bank. This action caused the placing in Class "B" by the use of cash in Class "A" of a substantial amount of assets upon which the old bank was compelled to pay six per cent, although the Commercial National Company's note for $300,000 substituted for cash bore 5½% interest and interest was also charged on the loans made to pay for stock in the new bank. All interest collected upon assets of the old bank went to the latter's credit.

Murrell was and had been for some two years executive head of the Continental American Bank and Trust Company, whose stock of some 28,000 shares was pledged to secure the note of the Commercial National Company. In addition, the old bank held or controlled some 1100 other shares of that bank's stock, which gave it control or more than 50% of the entire outstanding issue of 7000 shares. The purchase of the note of the Commercial National Company, from Hunter by the old bank, had simply transferred to the latter as collateral these 2800 shares of stock. It stood in the name of R. T. Moore, trustee, who was chairman of the board of directors of the old bank, and also chairman of the liquidating committee of that institution, presumably having been put in that shape while held by the wholly owned subsidiary of the old bank, the Commercial National Company.

During the course of the administration or liquidation of the old bank's affairs by the new bank, Murrell and Embry were largely in control as executive officers with such aid as was given by F. D. Lee, chairman of the board, and other directors of the new bank. Murrell had not been able to see eye to eye with Moore as chairman of the liquidating committee of the old bank in handling the latters' affairs and became concerned about the attitude he might take with respect to exchanging some obligations of the Continental American Bank & Trust Co. with the Reconstruction Finance Corporation for preferred stock of the obligor. He and Embry, believing that if the course they had decided to pursue leaked out, or if action was taken too soon, it might be thwarted by court proceedings, arranged with those in charge of the Commercial National Company's affairs to have a representative in the office of the new bank a few minutes before the latter's closing time, immediately preceding a meeting of the stockholders of the Continental American Bank & Trust Co. Demand was made upon this representative for the payment of the note of $300,000, which had been purchased from Hunter and for which the 28,000 shares of stock was held in pledge. It was known in advance and this representative admitted or confessed that the note could not be paid. Thereupon, the new bank as the holder of the note and stock, among assets of the old bank under the terms of the contract of December 3, 1932, proceeded to foreclose the pledge and buy in the stock for the account of the old bank as pledgee. With Murrell in control of the books and records of the Continental American Bank & Trust Co., it was promptly surrendered and new certificates issued in the name of another, for the account of the old bank, who would vote it to suit the wishes of Murrell and his associates in the Continental American Bank & Trust Co. Thus, the control of the last mentioned bank passed into the hands of the new bank's agents, with Murrell and his friends as administrators and liquidators of the affairs of the old bank.

This action of Murrell placed him, with respect to these 2800 shares of stock, as

968

well as the other shares held by the old bank, in a position, which to say the least, was one of divided responsibility and loyalty. As president and directing head of the Continental American Bank and Trust Company, he owed a very high duty to its stockholders and as president of the new bank, he and those responsible for the carrying out of the terms of the contract with the old bank, by the very nature of the undertaking, had placed themselves in the position of fiduciaries, in the view of the Court of Appeals, which latter relation was further strengthened by the fact that they had all been either directors or officers, some of them both, in the latter institution for years.

R. T. Moore was the largest single stockholder of the old bank and at a meeting of its stockholders on January 10, 1933, was elected as a member and chairman of its liguidating committee the other two members being A. J. Peavy and J. Katzenstein. His compensation was fixed at $5000 per year and he was given the use of an office in the new bank. His duties were to look after the interests of the old bank and its stockholders, to consult with and co-operate with the new bank in the administration and liquidation of the affairs of the old bank, and to report from time to time to its stockholders. Moore was also a debtor directly of the old bank for about $70,000 and was additionally liable as endorser or guarantor of other obligations of lumber companies, businesses, etc, in which he was interested, to the extent of several thousand dollars. He owned a home in the city of Shreveport which represented a very large investment, and just before or shortly after closing of the old bank, placed a mortgage thereon for the sum of $25,000, proceeds of which were not used but shortly thereafter returned to the lender, but the note was held by Moore and the mortgage remained uncancelled until he could get his affairs straightened out with the old bank. Moore also owned stocks and other securities amounting to several thousand dollars, which he had transferred to his wife and others within a short time of the reorganization, all of which continued until the settlement. In fact, Moore as a witness, frankly admitted that he had covered up this property to protect it from the new bank, as liquidators of the old bank's affairs under the contract of December 3, 1932, because of his belief that those in charge of the new bank would not hesitate to wreck him if they thought they could realize enough out of his assets to pay what was due to the old bank. He reasoned that by not paying anything until he was in a position to discharge all his obligations he could prevent such course. He made a final settlement of his indebtedness to the old bank in the fall of 1936 or nearly four years after reorganization.

The sale of real estate, the compromise and settlement of all obligations and accounts due the old bank where less than the face amounts thereof were paid were authorized by the Comptroller and this Court, and had the approval of a majority of the liquidating committee of the old bank. The net realization, after final liquidation from all sources other than Class "A" assets, (which represented cash or its equivalent taken over by the new bank, and used to offset a corresponding amount of liabilities assumed), amounted to $11,556,-454.41; against which there were liabilities assumed by the new bank equal to the assets placed in Class "B," which included the $1,000,000 note, amounting to $9,910,-221.60, thus leaving a balance, after the discharge of all liabilities assumed by the new bank, of $1,646,232.81.

On its books, the new bank's charge of 6 per cent on daily balances of assets in Class "B" amounted to $1,311,346.64; while its claim for services in liquidating "C" assets was the sum of $101,534.04, or a total of $1,413,880.68. These figures did not include any of the costs or out of pocket expenses for either class of assets, but only the compensation sought for services under the contract. Expenses claimed to have been incurred were for Class "B" assets $3,397.01 and for Class "C" $345,454.-41, or a total of expenses of $348,851.42.

Murrell and those associated with him had, in the organization of the new bank, taken away from Moore and his immediate friends the management and control of the institution known as the Commercial National Bank, with which the latter had been

connected for many years. The Moore group was anxious to get back into the business with a bank of its own, and with that end in view, sought to acquire control of the stock of the Continental American Bank & Trust Company. They had been successful, in competition with the new bank, in purchasing the building occupied by the latter, having paid therefor $10,000 more than the new bank offered for it. Thereupon the new bank moved out and the Moore group were left with the banking house on its hands and no tenant. Finally, the Comptroller authorized the receiver of the old bank to offer all the stock of the Continental American Bank & Trust Company held by the new bank for account of the old bank at public auction, which was done at the instance of and on the guarantee by the group with which Moore was associated that it would pay a minimum of $120 per share for the stock. They understood that the new bank was not interested in bidding on this stock, but on the day of sale one of the present attorneys for the defendant appeared and bid the sum of $127 per share, in the name of F. D. Lee, a former director of the old bank and chairman of the board of the new bank. It is admitted that this purchase was for the Murrell group in the new bank. The sale was promptly confirmed by this court on application of the receiver because it was thought to be an excellent sale, and later a suit was filed on behalf of certain stockholders in the old bank attacking it. This action was dismissed on the ground that the facts alleged did not charge fraud on the part of defendants therein, but merely legal conclusions.

W. K. Henderson, claiming to represent some of the stockholders of the old bank, and others in association with him, had instituted proceedings in the state court seeking to annul the contract of December 3, 1932, and also to compel the new bank and those conducting the administration and liquidation of its affairs to permit him and them to examine and audit the books and records of the old bank. In the spring of 1935, the new bank joined in a request to the Comptroller for an audit of the old bank's affairs to forestall Henderson's efforts. The audit was made under directions of the Comptroller's office, with instructions to the examiner to appraise the remaining assets on a *collectible dollar basis,* rather than a gradual liquidation of the type which had been followed up to that time. There is no explanation from any source why the appraisal was required on that basis. Ultimately, it made a great difference in the result insofar as solvency was concerned. The old bank was found to be insolvent by the examiner, to the extent of some $600,000, which, on further discussion with Embry, was reduced to approximately $350,000. This report of the examiner was made in June 1935, but the receiver was not appointed, and did not take his office until February 21, 1936, some eight months later. Here again, no attempt was made to explain the delay, but it would not be unreasonable to conclude that, since the new bank was the only creditor, its wishes, in the meantime could and probably did have some influence on the action of the Comptroller.

The new bank eventually vigorously urged the appointment of a receiver. It was finally joined in that request by Moore as chairman of the liquidating committee of the old bank, who sought the receivership for himself. Instead, the Comptroller named one of those on his list of professional receivers, who took charge and some four days later announced his idea of the value of the remaining assets and asked the new bank to make a bid therefor. Also, within an equally short time the latter made its proposal to take over the remaining assets, to be applied pro tanto on the balance due, plus an assessment of $300,000 against the stockholders of the old bank, in full settlement of the contract of December 3, 1932. This proposition was worked out largely by Embry; and both he and Murrell, and perhaps others, went to Washington to present it to the Comptroller. Murrell also put the proposition in writing after authorization of the board of directors of the new bank. However, it was never approved by the Comptroller.

It taxes credulity to ask one to believe that the first receiver was able to acquire any extensive knowledge of the old bank's

970

affairs within four days, even though Hawkins' examination of some eight months earlier may have been available, without reliance mainly upon the opinions and records of those in charge of the liquidating. It is also remarkable that Embry was able, within so short a time, to give his own opinion as to values, to the extent that he recommended, and the directors of the new bank approved, an offer for the remaining assets. However, this is more readily understandable than the quick action of the receiver. Embry had perhaps been the most active individual in the liquidation of the old bank's affairs, and therefore had the benefit of that familiarity with its assets.

Within a comparatively short time, the professional receiver was relieved and in his place Paul M. Brown was appointed. The latter had been strongly recommended by Murrell and other officers of the new bank. Brown, until a short time previous, had been an employee and cashier of the Continental American Bank & Trust Co., of which Murrell was president, and was, admittedly a very close personal friend and associate of the latter. He also knew that he owed his selection largely to those in charge of the new bank. Within a comparatively short time after his appointment, Brown's reports as receiver showed a decided increase in the deficit of assets as against liabilities of the old bank, which grew rapidly to some $800,000. Some two or three months later when the proposition to purchase the remaining assets by the new bank had been definitely turned down by the Comptroller the deficit dropped to some $200,000 and by the end of 1936 it had entirely disappeared, and Brown was showing a surplus of assets over liabilities of several thousand dollars. The record contains no sufficient explanation of these facts. The intervenors contend that it was done to aid defendant in purchasing the remaining assets of the old bank on its own terms.

With this statement of facts, which are either conceded or about which there can be little or no dispute, I shall proceed to a consideration of the case upon the issues which it is believed are before the court on this second trial as above stated.

Issue of Bad Faith.

As to bad faith on the part of defendant and its officers and agents, we start with the proposition that fraud is never presumed but the burden is upon the person claiming it to both allege and prove it by a fair preponderance of the evidence. Suspicion and the proof of circumstances which may reasonably be construed one way or the other are not enough. However, in a case such as this, those occupying the position of fiduciaries are under the duty to conduct themselves in such manner as to be free from all unfair dealings towards the cestui que trust, and are bound to account to the latter for everything which rightfully and according to the principles of equity should go to it. No profit from the trust can be claimed beyond that which is fixed in the contract or which is provided by the letter of the law in relationships imposed by it. 65 C.J. p. 225, Verbo Trusts.

The attorneys for the plaintiff receiver have taken the position that in view of the attitude of the Comptroller, they should be absolved from participation in the issue of bad faith, leaving this entirely to the intervenors.

The intervenors claim first, that there was early evidence of bad faith and a scheme to defraud in the events leading up to the closing of the old bank and the organization of the new bank, followed by the execution of the contract of December 3, 1932. They cite the bringing of Embry into a position of authority and his insisting upon broad powers, after a personal appeal by Murrell; the former's claim of having discovered within a very short time, after accepting employment, that the condition of the old bank was much worse than he had thought, which finding he admits he failed to report to the board of directors, so that they might have taken remedial steps; the appearance of examiner Sandlin from the same branch of the service in which Embry had so recently served, within about three months, and his severe handling and unfair appraisal of assets, which included an excessive and unjustified amount of estimated losses; Sandlin's recommendation for the creation of a new bank, instead of insisting that the directors

and officers of the old bank take what he considered bad paper out of it; the transaction by which the Hunter note and collateral of 2800 shares of Continental American Bank & Trust Co. stock were handled; the permitting by the Murrell group, or those in charge of organizing the new bank, of the use of approximately one-half million dollars of the old bank's money to buy stock in the new; the lending to other such directors of some $310,000 for the same purpose; and their keeping from still other directors, officers and stockholders knowledge of what was thus being done, until after all of it had been completed, when they knew the old bank would not be permitted to open again after its closing on December 3, 1932; thus giving these favored few an advantage over other directors and stockholders; and finally, because of the increase, since the first of the year 1932, of the amount of cash on hand and with other banks of approximately $1,500,000, together with the collection of more than $3,000,000 of loans and discounts, the old bank was in much better position on November 14th than it was in January, which demonstrated there was no justification for the pretended danger claimed by Sandlin and others. In other words, this contention of intervenors necessarily implies a preconceived scheme on the part of the organizers of the new bank to take over the business of the old bank, including its cash deposits, customers and assets, free of responsibility to old stockholders, who could not participate in the new bank, except as to what remained, after paying off depositors and ordinary creditors and thereby enabling defendant and its organizers to realize, for themselves, large profits in the way of interest charges, fees for services, etc.

■■ The conduct of the individuals in this case, both in Murrell's group, or those organizing the new bank, and those of the old stockholders and their friends and associates must be viewed according to conditions which existed at that time. As stated above, business generally was on the downgrade and this condition culminated in the banking holiday just about three months later. Very few people had ready cash. Apparently, it was necessary for those who provided capital for the new bank to raise it from whatever source they could, as illustrated by what they did, described above. It would hardly be contended that they should have used the old bank's cash to take bad paper out of the bank, in the manner that was done in organizing the new bank. They also took the risk of what they invested and the additional liability incurred as stockholders in the new bank. Can it be said, after fair consideration of the limitations of the human mind, that those charged with improper conduct in the course that was pursued, could, even with their knowledge of the old bank's affairs, have foretold the result of a liquidation of its assets under existing conditions to the extent of causing them to conspire with others, especially the Comptroller's Office, in wrecking the old bank, if they really believed it was not in serious trouble? While there is some difference of opinion as to what might have been done with respect to saving the old bank, there is no showing of the willingness or ability of any substantial number of its stockholders or directors to put up the money necessary to restore what the Comptroller through the examiner (their decision was final) considered a serious impairment of capital. Without definite action on one of the alternatives, the old bank probably would not have been permitted to remain open very long beyond December 3, 1932. While directors of the old bank were under a very high duty to act in the best interests of its stockholders, this did not subject them to penalties for honestly choosing what they considered the only feasible course they could pursue. The very nature of the responsibility gave them the latitude or discretion to use their best judgment. When a bank is about to fail in a community such as was involved here (a city of some 100,000 population with a wide trade territory, extensive oil fields, refineries, gas production, and large farming interests, in an area including portions of three states), things may be done which, under normal conditions, would not be fully sanctioned. The actions of men should not be judged too severely under such conditions. However, we are not here concerned with the question of validity vel non of the things

that were done, but with whether they prove bad faith or a wilful intent to injure the old stockholders. This is not a suit to set aside the contract of December 3, 1932, but a proceeding for an accounting of the old bank's affairs.

It is not believed that the evidence warrants a finding of bad faith from the circumstances preceding and including the organization of the new bank and the execution of the contract of December 3, 1932.

## The 6% Interest Charge.

■ The question of whether the provision of the contract for the payment of six per cent interest on daily balances was an evidence of bad faith, which of itself justifies the denial of compensation to the defendant for its services, seems to have been answered by the Court of Appeals holding that it was usurious, as a matter of law and could not be recovered. If that conclusion is correct the statutory penalty has been applied, and it is not felt that equity requires more. Six per cent interest was plainly and expressly provided for in the contract and was before the eyes of the representatives of the old stockholders who executed it. It would seem that a definite showing of coercion which the parties could not resist or from which they could not extricate themselves, was necessary, not merely the inference arising from their financial inability to solve the difficulties of the old bank by some other means.

## Tax Savings.

■ The savings made by the use of real estate included under the contract of December 3, 1932, was claimed on the theory, that lawful title to such property had passed to the new bank, which, while incorrect, as a matter of law, had the support of the Comptroller's office. Errors as to law, if honestly made, are not sufficient to constitute bad faith, justifying denial of compensation on this ground. 37 C.J.S., Fraud, § 24, p. 263; O'Connor v. Ludlam, 2 Cir., 92 F.2d 50.

## Purchase by the New Bank of the Continental American Bank & Trust Co. Stock.

■ As to the stock of the Continental American Bank & Trust Co., there can be little doubt but that Murrell and Embry with the former's thorough knowledge of its value and especially in view of the fact that he and his friends were in control and wanted to retain it, had planned very early to pursue a course that would attain that end. In the jockeying for control of this bank, Moore, in view of his relation to the stockholders of the old bank, was in no better position than Murrell, although he and his friends, like the Murrell group, in organizing the new bank, emphasized their willingness to have all old stockholders share ratably in the new organization when formed, provided they could produce cash for that purpose. But in each instance it seems clear that the promoters should have known that such course was beyond the financial ability of many of those who had not already entered into the respective plans. If we were confronted with an action of nullity to set aside the sale of this stock, the facts alleged, and shown on this trial, would require serious consideration, especially the refusal to permit prospective purchasers at receivers sale to obtain information about the affairs of the bank, a majority of whose stock was involved, to enable them to intelligently bid upon it. It was to the interest of the old bank and the duty of the new institution as liquidator, especially where its officers were in charge of both the new bank and the Continental American Bank & Trust Co., to see that every facility was afforded to encourage bidding in order that the best possible price might be obtained for this stock. The conduct of the defendant and its responsible officers with respect to the handling of this stock comes very close to bad faith of the character which was mentioned by the Court of Appeals. They knew in advance what the other group had guaranteed to bid. They had other information in their possession to aid them in bidding and there was the question of whether their relations to the matter were such as to prevent their becoming the purchasers. It may be that the Court of Appeals will consider the circumstances in connection with this matter sufficient to warrant a denial of compensation. It is my judgment that it should be taken into consideration in fixing the amount of compensation.

■ There were 350 shares of its own stock held by the Continental American Bank and Trust Co., which fact was not shown on the statement furnished to this court by Brown, receiver, when he applied for confirmation of the sale of that belonging to the old bank. Nor did the increase in value on the current market of certain securities appear upon the statement. However, it is not felt that this was a wilful omission. The increase in value of securities in the market is not customarily noted in a bank statement, since the market varies from day to day and month to month. Ordinarily the book or face value is shown, and while, if it were known to a prospective bidder for the stock that such securities had increased in value so as to add substantially to the value of the stock, there might be a disposition to pay more for it, it is not believed that the facts in this instance would have caused this court to refuse approval of the sale. Besides, action of the receiver can not be attributed to defendant without proper proof. There is the further circumstance that several of those composing the group, which I have called Moore's friends, were and had been for some time stockholders and directors in the Continental American Bank & Trust Co., whose books and records were subject to their inspection. Also, many of the facts complained of were actually known to some of the Moore group. A Mr. Murphy, who had agreed to participate to the extent of $100,000 in the purchase of control of this bank, was what might be called a hard-headed and successful banker, who testified that he would not have been willing to pay more for the stock had he known the facts in regard to the items relied upon to show bad faith in this particular matter. Another in this group, a Mr. Bean, said as a witness that he could have absorbed Murphy's commitment, even at a higher price, but the truth of the matter seems to have been that Murrell's group made such a substantial increase in the bid, aggregating nearly $40,000, out of the total price of approximately $500,000, that the others were not prepared to meet it. The stockholders of the old bank were the beneficiaries to the extent of $7.00 a share over the price which the Moore group would have paid.

As stated above, the Appellate Court may reach a different conclusion from that announced here.

### Defendant's Responsibility for Appointment of Receiver.

■ The determination of the solvency of the old bank and the necessity for the appointment of a receiver were matters within the judgment and discretion of the Comptroller. The very nature of the banking business is such that Congress evidently considered it better to entrust the control of national banks to the executive department of the Government, rather than to call into play the slow processes of the courts when insolvency or other serious troubles arise. However, this discretion is a legal one and may be abused just as in the courts. If such abuse is caused by the misconduct of the parties involved, to the extent that it appears reasonably certain that the course taken by the Comptroller would not have been pursued but for that conduct, it would seem that, notwithstanding the conclusiveness of the action by the Comptroller, the consequences may be visited upon those through whose fault the estate has suffered.

It has been demonstrated, I think, that the appointment of a receiver was not necessary.

Insolvency was found as the result of a type of appraisal known as the "collectible dollar basis," which is not contemplated in a fair and equitable liquidation of an estate such as this, under the conditions which prevailed, and were specifically noted in the agreement. In this instance there was a stipulation in the contract that "the affairs" of the old bank should "be liquidated in an orderly manner * * * under a plan that will insure full protection" to depositors and creditors "and will in the greatest possible degree, consistent with its own (the new bank's) interests, protect the interests of the shareholders and alleviate the injury, actual and potential * * * of *forced liquidation of the affairs*" of the old bank. (Emphasis by the writer.) The receiver did little more than to stand by and give attention to what was going on. All the work of administration, collection of bills and accounts, shifting of assets, etc., was car-

ried on by the new bank, just as had been done from the beginning, the change being that the receiver conducted the correspondence with the Comptroller's office, kept a set of books, and presented in his name applications for the court for approval of the sale of real estate compromises or settlements of claims for less than face value, etc. Before the end of the year in which the receiver was appointed, notwithstanding he had shown in the late summer or early fall an increased deficit or insolvency of some $800,000, the condition of the old bank, according to the receiver's own figures, (which were largely those furnished by the new bank) showed a surplus.

It is no doubt true that Henderson caused the new bank and its officers many headaches, but none of these justified the appointment of a receiver if the old bank was not insolvent, particularly, where all its property was in the hands of its only creditor, the defendant, who was vested with full authority to pursue any and all legal steps for the protection of that custody and for the liquidation of its affairs, the same as could be done by a receiver, except that perhaps there might be less doubt of the defendant's right to bid on or acquire the assets of the trust from a receiver than at a sale by itself. Strong evidence of the lack of urgency was the long delay between the finding of insolvency by the examiner and the appointment of the receiver.

It is contended by both the present plaintiff, receiver, and the intervenors, the facts so thoroughly demonstrate the original appointment was not necessary, that the defendant should be charged all the costs occasioned thereby. Defendant, of course, vigorously denies and opposes that contention, referring to the provisions in the contract that the new bank should not be held responsible for mistakes in judgment but only for fraud.

 It is the view of this court, however, that this question is controlled by the principle that, even though such stipulations be entered into, the trustee nevertheless is held to the conduct and care required of a prudent administrator, and, if he has unnecessarily imposed upon the estate expenses which can not be reasonably justified and it is shown they were caused to serve some personal end, then, in the accounting, he may be charged with the same as against any compensation that he would otherwise have been entitled to receive. C.J.Vol.65, p. 725, Sec. 549, Verbo Trusts. As witnesses, Murrell and Embry, particularly the former, insisted that the conduct of Moore with respect to his own indebtedness and his attitude towards accounts of certain concerns and individuals, had the effect of delaying and hindering the defendant in its efforts to liquidate the estate. However, all remedies which could be used under the receiver were equally open to the defendant without the appointment, if there was a disagreement with Moore. It had the right to make the decision. As a matter of fact, the new bank continued in control and undoubtedly "called the tune" through the receiver as to steps he should take, with the approval, of course, of the Comptroller, the same as it did before his appointment.

 I am convinced that the truth of the matter is that, both Moore and Murrell were casting "covetous eyes" upon this Continental American Bank & Trust Co. stock, and this coupled with Moore's covering up his own assets, created a personal feeling between these individuals, which caused both of them to lose sight of their responsibilities to the stockholders of the old bank and that it was principally for this reason that the receiver was sought. Moore probably believed, in view of the result of the examination by Hawkins of the old bank's affairs, on the basis used, that Murrell and others would be able to have a receiver appointed. He therefore made no formal objection and promptly sought the appointment through individuals he thought would be able to obtain it for himself. However, this did not succeed. After a short service, the professional receiver resigned and Murrell's selection, Paul M. Brown, was named. He served through the crucial period during which the stock of the Continental American Bank & Trust Co. was disposed of. Therefore, under the circumstances disclosed by this record, I believe the receiver was wholly unnecessary, to the knowledge of both the defendant, and to Moore as chairman of the liquidating committee of the old bank; and

since both were responsible (Moore not having opposed the request for a different motive), all expenditures by and for the receiver should be borne equally by the old and new bank.

### Attempt to Buy Remaining Assets.

 The fourth alleged ground of bad faith is the charge that defendant, after provoking appointment of the receiver, sought with the latter's aid, to purchase the remaining assets of the old bank for a fraction of their real value, and to also have a stock assessment levied against the stockholders of that bank. If it could be said that a fair preponderance of the evidence on this point supported this contention, then, of course, I think it would be sufficient, within itself, to justify the denial of compensation or the reimbursement of expenses. However, it must not be overlooked that there remained, as part of the unliquidated assets of the old bank these same 3900 shares of the stock of the Continental American Bank & Trust Co., which apparently, all along, had excited the interest, as it turned out, of both Moore and Murrell. But, even with this condition, we are left more or less to suspicion, plus the conduct of defendant, which, if it stood alone, might justify a conclusion that there was a preconceived scheme on its part, through Murrell and his friends, to acquire this stock for their own benefit and on their own terms. Yet, in order to reach that conclusion we must find that the Comptroller or his agents, the examiners, perhaps both, were in collusion with defendant and its officers. It is the positive testimony of Murrell and Embry, as well as of examiner Hawkins, that the suggestion for defendant to make an offer for the remaining assets of the old bank some four days after the receiver's appointment came from the said receiver and not from the defendant's agents; that Embry disagreed with the examiner and insisted that the deficit found of some $600,000 was too much; that it should be reduced nearly one-half; and that when Embry and Murrell went to Washington with the receiver for the purpose of presenting the proposal to purchase the remaining assets, Embry told the Comptroller what the new bank was willing to bid but stated it should not be accepted, and if not accepted, there should be no assessment against the stockholders. (This was further proof that Embry did not believe haste was required, or that there was, at that time any immediate prospect of a deficit.) This testimony is not contradicted.

If the idea that the new bank should purchase the remaining assets originated with the receiver, and if his appraisal was honestly and competently made, without suggestion or influence from the new bank, then it could not be said that the latter had "rigged" or engineered the matter for the purpose of acquiring them at a sacrifice figure. Considerable doubt is cast by the fact that the appraisal was made in such a short time with the offer following almost immediately. But, can the court, in such circumstances, say there was positive proof of a scheme and intention to abuse the trust, which was defeated only by the failure of the Comptroller to approve it? I think not.

My conclusion, therefore, is that while neither singly nor together the several grounds claimed justify a denial of all compensation, they do warrant a court of equity in fixing it at such a figure, as will, in view of the substantial advantages and profits derived by the new bank from the business and assets of the old bank, do justice to both sides.

 Defendant's counsel strongly contend that the relation of the new bank and that of its officers and agents to the old bank was not that of fiduciaries within the meaning of that word. It is said that: "Every duty, every obligation, every liability of this defendant must be based upon the provisions of the contract of December 3, 1932." This ignores the obligations of the organizers of the new bank to the stockholders of the old bank, arising from the fact that everyone of them was a director, and some officers, of that institution, bound not to do anything and not to take any position that was inimical to its interests. They could not, by the mere formation of a new bank, and the consequent going into liquidation of the old, shield themselves from those prior duties. While,

of course, the new corporate entity had certain rights and obligations, distinct from its officers and stockholders, still it was the individuals who acted for it, and in this instance particularly, who were the beneficiaries of its action. They could not in this manner absolve themselves from the responsibility which the law placed upon them. They simply substituted the ·new bank for themselves in carrying out those obligations, and it is believed that they could no more escape by this means than if individuals had been employed to perform the services of administering and liquidating the old bank's affairs. The substitution of performance, it seems, carried with it the transfer of duty. Most of the authorities cited in support of this contention involved contracts made at arm's length, such as a going bank coming to the assistance of another in trouble and taking over the latter's affairs for the purpose of working them out, with no prior commitment or fiduciary relationship, such as the directors and officers of the old bank in this instance bore. It is not deemed necessary to review those cases at length, but sufficient to call attention to those relied upon by the Court of Appeals, in stating the ·nature of the obligation in this instance. See also Kaufman v. Marquette National Bank, D. C., 289 F. 295.

### Compensation for Administering Class "B" Assets.

The basis for the belief that the defendant, if not guilty of bad faith such as to deprive it of all benefits, should be allowed a reasonable compensation for administering Class "B" assets, was stated in the opinion found D. C., in 64 F.Supp. 888, and need not be repeated. After considering the large volume of evidence, both oral and documentary, the court is more thoroughly convinced that this is peculiarly a case for the exercise of the broad powers and principles of equity, to the end that justice be done. Defendant contends that the issue of usury is barred by limitations, since more than two years had elapsed from the taking of credit for the interest, which, under the receivers, was based upon vouchers issued at stated inter-

vals to the defendant. Intervenors reply, in substance, that this is an action for an accounting by a trustee for the administration of its trust, which was not completed until the entire undertaking had been finished and its report made to the cestui que trust.

The nature of the business involved was not one in which the defendant held a fixed obligation for a definite sum, but was in effect a running account, in which debits and credits were continually accruing on both sides of the ledger. The mere entry thereon of a charge or credit was not final, like the payment of cash upon a note, which represented an unconditional promise to pay a fixed sum. See Lloyd v. Fidelity Nat. Bank, 169 Wash. 107, 13 P. 2d 504.

 I still think, and the Court of Appeals in this case has said, that, even the $1,000,000 note was not an obligation of the last mentioned character, but that its becoming a liability of the old bank was dependent upon the failure of the liquidation to produce an amount sufficient to discharge the obligations assumed, which condition never happened. Furthermore, in an accounting for the administration of a trust such as this, the trustee becomes a claimant for the sums which he asks for his services, as against which the plea of usury may be used as a shield, even though it would be barred in a direct action to recover under the provisions of the statute. McCarthy v. First Nat. Bank, 223 U.S. 493, 32 S.Ct. 240, 56 L.Ed. 523.

I do not believe the plea of prescription or limitations can be sustained.

Coming now to the question of how much compensation can be allowed for administering of this class of assets, the defendant's witnesses have given their opinions (which any attempt to fix the value of services must be) that the new bank should be paid almost to the dollar the amount which six per cent on daily balances would have produced. Most of these witnesses were either present or past officers or employees of the Comptroller's office, and while their views are entitled to much weight, the Court, at last, has to

use its own judgment. Sometimes, men, whose business it is to deal with the misfortunes of others, become hardened, perhaps unconsciously, and are inclined to look to the end accomplished rather than the means by which it is brought about, without the accompanying need for carefully weighing of all interests concerned. In matters such as this, they seem to acquire a collector's attitude as illustrated by the response of Mr. Keyes, defendant's chief expert on the subject, to questions by the court when he said, in effect, if not in exact words, that an opportunity such as that offered by this case for making a good fee happened very seldom, or once in a lifetime. On the other hand, a chancellor's duty is to inquire into the nature and extent of the labors performed, the skill, efficiency and integrity used by the claimant, and perhaps most important of all, the benefits of those services to the estate.

It was hard for this court to understand the attitude of all the witnesses for the defendant with respect to the advantages accruing to the new bank from the fact that it took over a going concern, with conditions favorable to the rapid building of a substantial banking business, if the administration was successful. The possibility, if not the probability, of such a result has been thoroughly demonstrated in this case by the condition of the new bank, even at the end of 1936 or about four years, to say nothing of final liquidation, and the claims made here, which, if allowed, would exceed by several hundred thousand dollars its entire capital. This was accomplished in a period when many other banks in the country were passing dividends or earning much less than they did prior to the depression; so much so, that both the national banking administration and those of the states permitted making of charges for services that were either unknown or rarely used before. One of the great advantages which this bank and all others derived from this change of attitude of government, was to be relieved from the payment of interest on certain types of deposit, which had averaged some $200,000 a year to the old bank. This

court has not overlooked the contention so strongly urged by defendant's expert witnesses, that the collection of delinquent accounts has a tendency to antagonize the debtors, thereby more than offsetting the advantages of acquiring the business of an old, well established bank. The simple answer seems to be that in this case that result did not follow to any great extent.

There is no disposition to deny credit to the management of the new bank, which undoubtedly had much to do with its success as against the management in the nineteen twenties. However, it must be remembered that the former not only had the benefit of the expensive lessons of the recent past, but were helped by the gradual improvement which took place, together with the overall strengthening of banking and similar businesses by the Federal Deposit Insurance Act and other measures enacted by a reform national administration. The machinery and setup of the old bank, in the way of facilities, personnel, correspondence, reputation, etc., in the banking world, made it possible for the competent new management to continue the business of the old bank in the new institution, with the public generally knowing little of the travail of its rebirth. That the new bank recognized and took advantage of the value of the past history and reputation of the old bank, was demonstrated, to some extent at least, by the special edition in the way of an advertisement in a local newspaper on the eve of moving into its handsome new seventeen story building.

Is it just and equitable that only those who had the means, or who chose to invest in the new bank, should reap large profits, simply because they gave that efficient and capable service, which they owed, not only to the new bank, but to the stockholders of the old bank as well? Murrell and Embry appear to have recognized the old bank's right to fair treatment in their protestations with respect to the purchase of the remaining assets, shortly after the appointment of the receiver, to the effect that they would rather lose a little than to make a profit thereon. Yet, the figures in the sums sought to be taken under the new bank's conception of fair treatment, which are substan-

tially the same as those being pressed now, speak more eloquently than words.

It is very difficult to separate the services performed as between Class "B" and Class "C" assets. They were frequently shifted from one to the other and undoubtedly much of the work was done on the same paper and properties while appearing at different times on the books in each category. As the assets of the old bank were collected and passed as cash into the coffers of the new, and liabilities assumed were reduced, the latter took on the growth and strength of a vigorous financial institution as was intended. There is no exact criterion by which compensation may be fixed in a case such as this. The total amount collected from both classes of assets, as stated earlier in this opinion, was $11,556,454.41 of which $9,910,221.60 was necessary to discharge the liabilities assumed which equalled Class "B" assets as they were classified pursuant to the contract of December 3, 1932. This represented both the minimum and maximum liability under that head. It is believed therefore that 5 per cent of this amount, or $495,511.08, would be full value and ample compensation for the services performed. If $9,910,221.60 was collected from Class "B" assets, the remainder necessarily fell into Class "C." Applying the same rate would entitle the new bank to receive the sum of $82,111.64.

It is somewhat remarkable that the new bank, in its claim for expenses in the administration and liquidation of the two classes of assets, showed only $3,397.01 as attributable to Class "B," which aggregated nearly $10,000,000 in amount, while the sum of $345,454.41 is claimed to have been expended on collecting Class "C" assets, amounting to the said sum of $1,646,232.81. Whether in reality there was a much larger expenditure on Class "C" because of their inferior character and the greater efforts necessary to make collection, or whether these charges were passed to that class, in view of the terms of the amended contract, there is no way of knowing. In the result reached here it makes little difference.

Counsel for the receiver point to the statement of expenses appearing on page 518 etc. of the printed record on the former appeal of $172,818.98, which were filed in the lower court on April 4, 1941. They say this is the total amount which defendant should recover rather than the sum of $345,-345.93, the argument being that the former sum was all that defendant claimed at that time when administration of the estate had been completed. This statement in the former record begins at page 518, marked "D 4" or "Schedule II," was headed "Pro Rata of Salaries of Officers and Employees Due by Receiver of the Commercial National Bank of Shreveport in Matter of Administering Class 'B' and Class 'C' Assets to and Inclusive of April 30, 1939 Under Contract." The items making up the latter figure above, for expenses now claimed, are set forth in "Hoffman No. 11" introduced on this second trial. This exhibit bears the heading "Summary of Expenses Incurred and Paid by the Commercial National Bank in Shreveport in Connection with Realization of the Assets Taken Over by It From the Commercial National Bank of Shreveport, from December 5, 1932, to December 31, 1945, Inclusive."

Embraced in "Hoffman No. 11" are such items as the salary of the chairman of the liquidating committee of the old bank, at $5,000 per year, beginning with 1933, and continuing until the appointment of the receiver on February 21, 1936, receiver's expenses, telegrams, traveling expenses, real estate expenses, including salaries, etc. of the manager of a plantation, legal expenses, taxes, depreciation, etc. It therefore appears that the statement of expenses now relied upon included a large number of items that were not in the ones submitted on the first trial. Since this claim is supported by the testimony and records of the defendant without substantial dispute, recovery thereof seems warranted by the conclusion reached in this case. There should be deducted from the total of expenses allowed with respect to both "B" and "C" assets, the one-half of all the expenses of the receivership (including receiver's compensation) embraced in the above figures, as the portion of this expense assessed against the defendant for reasons heretofore stated. It should also be ascertained whether there is any duplication here of

expenses of the receiver which are included in the gross amount of the costs of the Receivership.

There should be judgment in favor of the plaintiff and intervenors and against defendant for the amounts and in accordance with the conclusions reached herein.

Proper decree should be presented.