## COMMERCIAL NAT. BANK IN SHREVE-PORT v. CONNOLLY et al.
### No. 12329.

United States Court of Appeals
Fifth Circuit.

Sept. 6, 1949.

Rehearing Denied Nov. 16, 1949.

See 177 F.2d 514.

Sidney L. Herold, Shreveport, La., Sidney M. Cook, Shreveport, La., E. B. Stroud, Dallas, Texas, for appellant and cross-appellee.

Monte M. Lemann, New Orleans, La., Otis W. Bullock, Shreveport, La., S. W. Plauche, Sr., Lake Charles, La., S. W. Plauche, Jr., Lake Charles, La., Marion K. Smith, Shreveport, La., Byron D. Bullock, Shreveport, La., for appellee and cross-appellants.

Before HUTCHESON, SIBLEY, HOLMES, McCORD, and WALLER, en banc.

WALLER, Circuit Judge.

The several opinions [1] heretofore written render it unnecessary to restate the legal and factual issues involved or to engage in

---

1. See Leslie v. Commercial Nat. Bank, D.C., 28 F.Supp. 927; Rawlings v. Commercial Nat. Bank in Shreveport, D.C., 44 F.Supp. 5; Commercial Nat. Bank in

extended discussion. Consequently this opinion will merely undertake to set forth the following conclusions of the majority of the Court, en banc:[2]

■ A. The doctrine of the law of the case usually raises a disinclination on the part of an appellate court to re-examine its own prior legal pronouncements in a case, but the doctrine does not destroy its power to do so.[3] Five judges of this Court, sitting en banc, have the power, and a majority has the inclination, under the special circumstances of this case, to re-examine questions decided on a former appeal by a divided three-judge panel where several issues and much evidence appear in the second appeal that were not directly presented in the first.

■ B. The contract of December 3, 1932,[4] between the Old Bank and the New was legal and binding in all of its aspects.

■ C. The provision in the contract whereby the New Bank assumed all the liabilities of the Old in consideration of the transfer to the New Bank of an equal amount of Class A and B assets and the execution and delivery of a note for $1,-000,000, together with the right to receive six per cent on the daily balances of Class B assets after the reduction of such liabilities by the application of the cash assets as collected, was binding on the parties and their privies.

■ D. The Class A assets were accepted as cash and were immediately applied in reduction of the amount of the assumed liabilities so that throughout the period in which six per cent interest was charged on the daily balances of the Class B assets the liabilities assumed were in the exact amount of the Class B assets, and as Class B assets were collected or transmuted into cash, the liabilities assumed were reduced accordingly so that the daily balances of Class B assets were constantly the exact equivalent of the daily balances of the liabilities assumed and outstanding. There was, therefore, no financial difference in computing six per cent on the daily balance of Class B assets and in computing six per cent on the daily balance of assumed liabilities, and since equity should look at substance rather than form, the majority holds that the term "interest" as used in the contract was intended to be a charge of six per cent on the amount of the assumed and outstanding liabilities as compensation for assuming such liabilities, for servicing said accounts, for keeping the records, and for collecting and paying over to the Old Bank[5] the rents, interest, and other revenue derived from the principal of the Class B securities, but that same, whether viewed as interest on debts assumed or as a service charge or as compensation, was not usurious.

In a consideration of this question it will at once appear obvious that since the New Bank was required to collect and pay to the Old Bank the interest drawn by the Class B securities, it was essential that some arrangement be made in order for the New Bank to pay expenses and to operate without loss since over $9,000,000 of its assets were in Class B securities yielding to it no interest whatsoever other than the charge or discount of six per cent provided by the contract, and it should not be inferred, in view of the language of the con-

Shreveport v. Parsons, 5 Cir., 144 F.2d 231, rehearing denied, 5 Cir., 145 F.2d 191; Parsons v. Commercial Nat. Bank in Shreveport, D.C., 64 F.Supp. 888; Connolly v. Commercial Nat. Bank in Shreveport, D.C., 72 F.Supp. 961.

**2.** Judge Lee, being disqualified, did not participate.

**3.** Messinger v. Anderson, 225 U.S. 436, 32 S.Ct. 739, 56 L.Ed. 1152; Texas Company v. Pensacola Maritime Corporation, 5 Cir., 292 F. 61; and Hotel Markham, Inc., et al. v. Ball, 5 Cir., 131 F.2d 424.

**4.** See excellent statement as to provisions of contract in opinion by Judge Dawkins in 44 F.Supp. 5.

**5.** Under the contract the New Bank was to receive six per cent straight on Class B accounts while the Old Bank was to receive whatever interest and revenue was collected from B as well as C assets. The $1,000,000 note was placed in Class B and drew six per cent, which was credited to the Old Bank, and since the New Bank also received six per cent on this note it entailed neither gain nor loss to either.

tract and the construction placed on it by the parties, that the New Bank would have assumed the liability, risk, and expense attendant upon fulfilling the contract without the right to retain the interest and revenue produced by the Class B securities, and with no interest or compensation whatsoever. Such a profitless operation would have impaired the New Bank's capital very promptly, because the expense of serving thousands of depositors and their accounts totalling in excess of $9,000,000 the collection of notes, the paying of rent, taxes, and the like, cannot be met out of the fine asset of good will alone. No capable banker or sensible business man would assume $9,000,000 of liabilities payable mainly on demand for the sole consideration of the transfer of $9,000,000 of noninterest bearing, slow-moving, unliquid securities. We take it that no security is liquid which cannot yield interest to the transferee.

The admission of counsel for the receiver in the first hearing and the final decree of the lower Court on its first hearing to the effect that there were no legal grounds for denying the New Bank the right to receive six per cent on the daily balances of the B assets were correct.

■ E. The majority of the Court now sitting in the case is of the opinion that the A assets and the principal or body of the B assets, including the note of the Old Bank for $1,000,000—totalling the exact amount of the liabilities of the Old Bank assumed by the New—were transferred to, and became the property of, the New Bank, subject to Paragraph VI of the contract as to any B assets remaining on hand after the assumed liabilities had been paid, and coupled with a right of substitution by the New Bank of any B asset for any C asset. This conclusion is the result of the following considerations:

■ (1) The idea of the New Bank merely becoming a gratuitous surety or guarantor for the Old Bank, whose capital was then impaired and which was then about to go into liquidation, seems entirely inconsistent with reason and sound banking practices; (2) the universal requisite for a bank to be solvent that it must own assets in an amount at least equal to its

liabilities; (3) that the New Bank could not have opened for business with an assumed liability of some $14,000,000 unless it also owned assets of at least an equal value; (4) that it could not have continued in the business of handling for another so large a portfolio of assets and liabilities without interest or compensation; (5) the plain wording of the contract; (6) the letters from the Chairman of the liquidating committee to the stockholders of the Old Bank; (7) reports to Comptroller of the Currency; (8) the resolution of the stockholders and directors of the Old Bank; (9) the testimony of the officials in the office of the Comptroller of the Currency; (10) the absence of any requirement in the contract that the New Bank should be required to report to the liquidators of the Old Bank as to collections made of the B assets; (11) the interpretations by the parties themselves; (12) the provision of the contract that Class A and B assets were to be carried on the general ledger where only assets owned by a bank outright are ever carried; (13) and finally, the absence of any requirement for the New Bank to return Class A and B assets to the Old Bank except as this obligation was imposed by Par. VI of the contract on the New Bank, if unused.

These factors demonstrate conclusively that the considerations for the assumption of the liabilities of the Old Bank by the New Bank were the transfer of the title to the Class A assets (which were the equivalent of cash) and the Class B assets, with six per cent thereon but less the interest collected on the Class B securities, and that the transaction insofar as Class A and B assets were concerned was not merely a pledge of such assets. It was a transfer of a title absolute and unconditional as to Class A assets and defeasible under Par. VI of the contract as to any of the B assets not consumed in discharging the liabilities the New Bank had assumed.

■ F. Having reached the conclusion that the New Bank acquired the legal as well as the equitable title to Class A and Class B assets, together with the right of substitution of Class B assets for Class C, the New Bank was authorized and legally

entitled to include in its capital stock tax return to the State of Louisiana, and to take as deductions, the value of any real estate formerly belonging to the Old Bank that was included in, or substituted into a Class B asset, and rightfully carried on the general ledger account of the New Bank, and to the benefit of any savings that accrued by virtue of inclusion of said real estate, but, for the reasons set out in Paragraph G below, it was not entitled to such savings on real estate in Class C held by it, and the New Bank should account to the receiver of the Old Bank for all such savings as accrued to it from the inclusion of any Class C real estate in its capital stock tax return.

G. The New Bank did not acquire, and could not acquire, under the contract, the equitable title to Class C assets except by the substitution of Class B assets therefor as above mentioned. The contract expressly provided that these assets should not be carried on the general ledger of the New Bank. The equitable title to the Class C assets, together with the interest stipulated in the Class B and C securities, remained in the Old Bank, to which the stockholders of the Old Bank had to look for any recovery. From this it follows that Class A assets, the principal of Class B assets, and the $1,000,-000 note, so long as it was a Class B asset or, that is, prior to such time as it became a Class C asset,[6] were acquired by, and became the property of, the New Bank, as to which properties the contract was one of acquisition and sale as distinguished from the agreement as to Class C assets, which was an agreement of liquidation and indemnity, and not one of purchase and sale. The contract, in respect to Class C assets, placed the New Bank in a relation of trust and confidence to the Old Bank, but such a relation inheres only collaterally, or incidentally, as to Class A and B, or only insofar as any right to indemnity out of Class C was concerned. It is obvious that if the New Bank acted fraudulently in the handling of a Class B asset so as to impair its

collectibility, any resort to Class C assets for indemnification would decrease the aggregate value of the Class C assets to be returned to the Old Bank.

We are of the opinion, from a construction of the entire contract and the purpose and intent of the parties, that Class C assets were merely pledged—subject to the right of substitution aforementioned—as indemnity or security to the New Bank against loss in the assumption of the liabilities and in payment of expenses, costs, and charges. In such a situation the law of Louisiana seems to be that a relation of trust exists between the New Bank and the Old in reference to said C assets so pledged, and that the New Bank, as such pledgee or trustee, should use the fruits of the pledge only for the benefit of the pledgor or cestui que trust unless the contract or pledge otherwise provides. Hence it follows that such increments, fruits, or profits as derived from Class C real estate savings made in the capital stock taxes of the New Bank should have been credited to the Class C Assets Account.

H. The Court below found that the appointment of a receiver was unnecessary but that since an audit had been requested by both the New Bank and the liquidating committee of the Old Bank, and the appointment also requested by the New Bank and the chairman of the liquidating committee of the Old Bank, the expenses of the receivership should be divided equally between the New Bank and the Old. This being a collateral attack upon a receiver lawfully appointed by the Comptroller and recognized by the Court below and by this Court as the lawful plaintiff in this suit, we cannot accept the finding that a receivership was unnecessary, but on such collateral attack we must assume that the receivership was necessary. At least we must regard it as having been deemed reasonably necessary at the time of the appointment. If, however, we could accept those findings, we would still be unable to concur in the conclusion of the lower Court

6. We understand that the $1,000,000 note has been transferred to C assets and that no liability either to the New Bank or to the Receiver of the Old Bank at-

taches to it, but that it is in position to be canceled and not considered as an asset of the receivership.

as to their resulting effect. We feel that the following features of this matter should not be overlooked.

1. The appointment of the receiver was made by the Comptroller of the Currency upon the finding of a National Bank Examiner that the Old Bank was then insolvent.

2. There is no proof that the request for the appointment of a receiver, even though mistakenly made, was made in bad faith, and any assertions of ulterior purpose in requesting the appointment of a receiver are unsustained.

3. The receiver who brought the present suit, and who will recover for the stockholders and intervenors a substantial sum, at no time recommended that his appointment be vacated, and he is in no position to question or to repudiate his own appointment. The intervenors who can intervene in a suit only in recognition of the propriety of the main proceedings likewise have never requested that the appointment of the receiver be vacated or, prior to the filing of their intervention in this suit, ever objected thereto, but, on the contrary, are here now staunchly supporting and urging a recovery by the receiver whose tenure is still unattacked, and at whose suit they are to receive large recoveries.

4. The success of the receiver in collection, beyond expectation, of the assets of the estate entrusted to him is not an unfailing test by which the inadvisability of the appointment of a receiver should be measured, for neither the New Bank, the Old Bank, the Bank Examiner, nor the Comptroller would be expected to foretell that improved business conditions would occur and that delinquent debtors would pay off to a greater extent than conditions at the time of the appointment might have indicated. The salutary results achieved by a receivership are hardly conclusive proof of the lack of the necessity for the appointment of a receiver.

■■■ In the absence of convincing evidence that the appointment of a receiver was either collusive, capricious, venal, or in bad faith, the law does not ordinarily contemplate that the expenses of the receivership will be charged other than against the fund administered by the receiver, even though the Courts are vested with a discretion in determining who should pay the costs and expenses of a receivership in unusual instances. But it seems quite incongruous to visit upon the defendant in this case the cost of the receivership on the theory that it was unnecessary when it appears that the chief industry of the receiver has been the prosecution of this suit, over a long period of time, against the defendant, out of which very substantial sums are to be recovered. The vigor with which this suit has been prosecuted against the New Bank gives little credence to the contention of the plaintiffs that the receiver was but a tool foisted on the Old Bank to do the bidding of the New. The large recovery in the first trial and in the second leave us considerably unimpressed by the collateral contentions that a receiver was needless. The majority finds that the expenses of the receivership should be paid out of the fund in the hands of the receiver.

■■■ However, we think the fact that the New Bank was one of the moving spirits, if not the moving spirit, in securing the appointment of a receiver should be considered in connection with a determination of the expenses and compensation to be allowed the New Bank in connection with the liquidation of the C assets. We also think that such a request by the New Bank, even though joined in by the liquidating committee of the Old Bank, should be considered in the nature of an abandonment by the New Bank of its contractual right and obligation to liquidate such assets. This is not to say, however, that in law or in equity it would be estopped to claim compensation for its services in administering the Class C assets to the date of the receivership. It is to say, though, that its failure to complete the liquidation, its request for the appointment of a receiver to do that which it had agreed to do, together with the large benefits and compensations that had accrued to it out of the arrangement between it and the Old Bank, considered in the light of the provision in the contract that compensation to the New

Bank for liquidation of Class C assets should be reasonable, bring strongly up the question whether there is not sufficient basis for holding that all compensation, other than nominal, to the New Bank for its incomplete services in the liquidation of Class C assets be denied, and whether, while it is entitled to the actual, reasonable, and out-of-pocket expenses incurred by it in and about the liquidation of said Class C assets, the expense account allowable as to such assets should not be reexamined and redetermined.

In this connection it should also be stated that we concur in the conclusion of the Court below that the evidence did not warrant a finding of bad faith on the part of the officers and directors of the New Bank. That there were instances of bad judgment, yes, but some of these were discoverable only by hindsight. Bad faith in the purchase of certain shares of stock at a sale by the receiver at public auction by a group, of whom some were connected with the New Bank, wherein the sale was duly approved by the Court below, and wherein the purchasers paid $7 more per share for the stock than was bid by the next highest bidder, a group acting for interests connected with the Old Bank, is not made to appear. The sale was by the receiver, the plaintiff—not by the New Bank. Therefore, what we have said as to re-examination and redetermination of compensation and expenses to the New Bank for services and out-of-pocket expenses in partial liquidation of Class C assets is not influenced by any conviction of bad faith.

The judgment of the lower Court is reversed and the cause is remanded with directions to the lower Court to enter a decree in accordance with the views herein expressed, and that the New Bank be adjudged to pay one-half, the receiver one-fourth, and the intervenors one-fourth, of the costs incurred in the retrial and on this appeal.

Reversed and remanded.

HOLMES, Circuit Judge (dissenting).

We agree with the majority opinion that three of the judges of this court have the inclination to re-examine questions decided on the former appeal of this case, and that they have the power to do so; but inclination and power are not synonymous with law and justice; the decision of a court needs something more to recommennd it than the qualities of tyrrany; it should be something that is an attribute to God Himself. Justice weeps if the law of the case does not last long enough for the parties litigant to have an accounting under it; and the aphorism of the scholars is exemplified: Res iudicata facit de albo nigrum et de quadrato rotundum.[1]

In the dictionary we find that the word interest, as used in the context "interest on daily balances computed at the rate of six per cent per annum," means a premium paid for the use of money, but in the decision today we note that the word has a special meaning, which is found in no dictionary and sanctioned by no lexicologist. We are told that this extraordinary meaning applies only in one clause of paragraph V of the contract. Elsewhere the word is given its usual acceptation. We also note that the court was careful by interpretation to reform the contract and leave out the word interest, when it said that the new bank was entitled to receive six per cent per annum on the daily balances of Class B assets.[2] This was after it had held in the preceding paragraph that the contract of December 3, 1932, between the old and new banks was legal and binding in all of its aspects.

The new bank having advanced no money on which it was entitled to interest under the contract, the court now sets aside the previously existing law of the case and rewrites the contract to conform to the incompetent testimony of the officials in the office of the Comptroller of the Currency, which the district court correctly refused to consider. This item of six per cent per

---

1. The judgments of courts can turn white into black and square into round.

2. The new bank, however, put a different construction on it in practice, as in-

dicated by the fact that it invoked the bankers' customary short year of 360 days, which only applies in figuring interest that is charged as compensation for the use or detention of money.

annum on Class B assets is upheld as a service charge. According to the majority opinion, this charge is allowed for collecting and paying over to the old bank "the interest drawn by the Class B securities." This, it is said, includes keeping records, collecting rents, interest, and other revenue from Class B assets; it amounts to $1,311,-346.64. Call it usury, interest on liabilities, service charge, or what you will, this amount should shock the conscience of the court, and no strained interpretation should be indulged to uphold it. It is being allowed upon the theory that the pledged assets were held in trust and that the new bank was acting as agent or trustee in collecting and paying over the revenues therefrom. This was admitted on the prior hearing, and this was the theory on which the old bank was charged with ad valorem taxes on real estate paid by the new bank; but when the majority opinion comes to an item of $191,778.55 for taxes saved on its capital stock by claiming title to certain real estate owned by the old bank, the court holds that the new bank was authorized and legally entitled to include this real estate in its tax return because it was "the legal as well as the equitable owner of Class A as well as Class B assets." Thus, in servicing Class B assets, they belonged to the old bank; in saving taxes on capital stock of the new bank, the same assets belonged to the new bank; and then, without blinking an eye, the old bank is charged ad valorem taxes on the same real estate, whether in Class B or Class C assets.

On the prior appeal, there was one feature of this case as to which there was no dispute: the court and attorneys for both sides were in accord as to the character of the new bank's title to the assets conveyed to it by the old bank. The transaction was not a sale but a pledge; under the Louisiana law, it was a pledge of a dual nature, know as the pawn and the antichresis.[3] The two banks sustained toward each other the relation of pledgor and pledgee, as well as that of liquidator and cestui que trust.[4] Under the new law of the case, dis-

pensed by the majority of the court as now constituted but possibly not binding on another appeal if other judges are sitting, the new bank acquired the legal as well as the equitable title to Class B assets, together with the right of substitution of B for C assets, and therefore it was perfectly legal to include B assets in its capital-stock tax return while at the same time charging the Class B ad valorem real estate taxes to the old bank. The result of this legal anomaly is that the new bank has the legal and equitable title to certain real and personal property, the rents and revenues from which belong exclusively to the old bank. The opinion does not explain, nor is it perceived, how it would be possible for one to be the legal and equitable owner of property with no duty to pay the ad valorem taxes thereon and no right to receive the income therefrom. "The power to dispose of income is the equivalent of ownership of it", Helvering v. Horst, 311 U.S. 112, 118, 61 S.Ct. 144, 147, 85 L.Ed. 75, 131 A.L.R. 655; and the right to receive the income, coupled with the duty to pay the taxes on it, is the equivalent of owning the property. A grantor who conveys property in trust, retaining the right to the income therefrom and the reversion of the corpus, may be deemed the owner where the benefits retained blend with the normal concepts of ownership. Cf. Helvering v. Clifford, 309 U.S. 331, 60 S.Ct. 554, 84 L.Ed. 788.

The writer of the present majority opinion wrote as follows, when dissenting on the prior hearing [144 F.2d 245]:

"The new bank took the real estate and other assets of the old bank as indemnification, and the new bank was merely a pledgee or trustee of the legal title; nevertheless, in the assessment of taxes on its capital stock it deducted the value of the old bank's real estate from the book value of its own capital stock with the result that its capital stock taxes were reduced, over a period of nine years, in the total sum of $191,778.55. The lower Court found, and the majority has agreed, that this sum was in the nature of a profit or fruit derived by

---

**3.** Articles 3133, 3134, 3135, 3136, and 3137 of the Louisiana Civil Code.

**4.** 144 F.2d 235; to the same effect, see the dissenting opinion; 144 F.2d 245.

the new bank from the real estate of the old, and that as pledgee or as trustee the new bank should be required to account to its pledgor, the old bank, for this so-called fruit or profit from the old bank's real estate. The premise is false and consequently the conclusion is likewise. Unquestionably, if the new bank under such circumstances had received rents, crops, or fruits from the land of the old bank it would, of course, be required to account to the owner therefor, but in the present case the savings in taxes came about as a result of a legal conclusion from an assumed fact and not from any fruit or profit from the old bank's realty. As a result of the shrewdness of the new bank, plus the stupidity, or cupidity, of the taxing authorities, the new bank was allowed to take a deduction in its capital stock assessment to the same extent as if it had been the real owner of the old bank's real estate. The old bank's real estate did no smart thinking or acting and was not responsible for the stupidity, or cupidity, of the taxing authorities. The situation is not dissimilar from one where a person was able to establish a line of credit with a bank on the assumption that he was the owner of real estate of which he was merely the trustee of the naked legal title. If one, by virtue of the establishment of a line of credit on the foregoing assumption, uses the credit thus made available to make a business profit without in any wise using the land or jeopardizing the title of the equitable owner, it is difficult to see by what process of reasoning such a profit could be considered a fruit or profit from the land, or that it should accrue to the real owner. In the present case the new bank did not jeopardize the title to the land of which it was the naked legal trustee. It took nothing from the land. It made no actual use of the land. The transaction left the old bank no worse off. It was injured not in the least by the transaction, but this much cannot be said for the State of Louisiana. It, and it alone, suffered, but the fact that the pledgee or trustee of the legal title evades or avoids his taxes on his own property through an erroneous assumption of fact as to an undeserved deduction does not give rise to any right in another to claim and have that which the trustee has

by his shrewdness evaded and avoided in connection with his own business. All parties seem to have proceeded on the theory that it was all right to gyp the State of Louisiana but some think it wrong to gyp the old bank. But even if the savings were lawful, they were the result of shrewd thinking and acting on the part of the new bank, and the taking advantage of an assumed fact rather than taking fruit or profit from real estate. Fruits or profits from land arise out of tilling, grazing, leasing, or selling.

"The old bank and the new entered into a written contract which the plaintiffs do not seek to avoid but to enforce. The parties were dealing at arm's length. It is true that the new bank was the trustee of the legal title of the old bank to its real and personal property. This required the new bank: (1) to keep the property safe; (2) to keep proper records relating to this property; (3) to account for this property at the proper time; (4) to use all reasonable diligence to collect debts due the old bank; and (5) to pay its obligations. But the new bank could not compromise any claims or sell or dispose of any of the assets of the old bank without notice to the liquidating committee of the old bank. The banks agreed on all of these things. The powers of the new bank were covered by the contract. Whatever there was of trusteeship was an incident to the relationship of debtor and creditor, obligor and obligee, or principal and guarantor. Taking possession and management of the collateral and real property of the debtor was but an incident to the contract and the trust relationship extended only to the duty to hold the property of the old bank, collect up its debts, and pay its obligations, and thus protect itself from liability and the stockholders of the old bank from stock assessments."

We quote the above not to give all of it our approval but to illustrate the effect of the incompetent testimony of witnesses whose opinions were excluded below and are adopted here. It is not necessary to say that the state was defrauded or that its officers were delinquent in this matter. The new bank used the old bank's real es-

tate to save taxes on the new bank's capital stock. The controlling principle here is that a fiduciary has no right to retain a profit made in connection with a transaction conducted by it as a fiduciary.[5] See Restatement of Restitution, Sec. 1, p. 14, also Restatement of Agency, Sec. 388. In their brief upon the prior appeal, the attorneys for the new bank did not take issue with the doctrine that the fruits of the pledge must be accounted for by the pledgee. They said: "These principles are stated in the Civil Code, Articles 3162 and 3005. They are not peculiar to the civil law; they exist in the common law." They contended, however, that the principles applied only where the profits were secretly acquired. There is no such limitation; profits must be accounted for whether secretly or openly acquired. See Restatement of Trusts, Sections 203, 206j. Our prior decision on this point has been cited with approval by the Supreme Court of Louisiana. See Wells v. Dean, 1947, 211 La. 132, at page 144, 29 So.2d 590, at page 594, where the court said: " * * * In the case of Commercial Nat. Bank in Shreveport v. Parsons, 5 Cir., 144 F.2d 231, 236, rehearing denied, 5 Cir., 145 F.2d 191, certiorari denied 323 U.S. 796, 65 S.Ct. 440, 89 L.Ed. 635, this same doctrine is approved in the following language: 'The relation between debtor and creditor or principal and guarantor is not necessarily one of trust and confidence, but that between pledgor and pledgee or liquidator and cestui que trust is inherently one of a fiduciary character.'"

See also Restatement of Agency, Sec. 388, and 49 C. J. 920, from which this court in its opinion on the prior appeal quoted as follows: "The duties and relations of a pledgor and pledgee are governed more by the general maxims of equity than by the strict rules of common law. The very nature of the transaction gives rise to a trust relation between pledgor and pledgee, with its consequent duties to protect the debt or obligation and the collateral." 144 F.2d at page 236, footnote 3.

These considerations demonstrate that, even if expressions of opinion by the Comptroller's office were admissible in evidence, they are entitled to no weight, because they were erroneous, contrary to the defendant's own pleading in its original answer, contrary to the provisions of the original contract, and contrary to the course of action of the new bank in the performance of the contract. In a letter to counsel for the receiver, the Comptroller said:

"With regard to the depositions given by Messrs. McCandless, Folger and Stover of my staff, I will say that whatever of opinion is contained therein should be considered as opinion only, to be countered by such other facts or other opinions as counsel, including counsel for the receiver, may be able to bring to bear * * *

"It has been our experience that office opinions have little effect upon litigation when the courts have disagreed with a position previously taken, as illustrated by the following cases: See Leonard v. Gage (C.C.A.4, 1938), 94 F.2d 19; City of Fort Worth v. McCamey (C.C.A. 5, 1938), 93 F.2d 964; LaParr v. City of Rockford (C.C.A.7, 1938), 100 F.2d 564; Haight v. City of Syracuse (D.C.N.D.N.Y., 1940), 38 F.Supp. 244."

To the cases thus cited by the Comptroller may be added United States Shipping Board Merchant Fleet Corporation v. Rhodes, 297 U.S. 383, 56 S.Ct. 517, 80 L.Ed. 733; In re Chetwood, 165 U.S. 443, 17 S.Ct. 385, 41 L.Ed. 782; Dixon v. Gage, D.C., 18 F.Supp. 895. In the Chetwood case, the receiver, acting upon the instructions of the Comptroller, declined to bring suit to recover judgment in favor of a closed bank for alleged wrongful acts of its managing agents. One of the stockholders thereupon brought a suit in behalf of himself and other stockholders. The receiver was made a party defendant but, it was averred, assumed an attitude of hostility to the prosecution of the suit. The suit thus brought resulted in a judgment against the delinquent officers. If it had been left to the Comp-

---

5. The majority now concedes the application of this general principle by allowing to the old bank the tax saving as to Class C assets.

troller and receiver in that case, no judgment would have been obtained, and the same comment is applicable to the facts of the other cited cases.

The majority opinion holds that whatever tax savings on its capital stock were derived by the new bank from the use of real estate in Class C assets should be credited to the Class C Assets Account. This means that the fruits, profits, and tax savings, on Class C assets belong to the old bank. This ruling is predicated on the principle for which the appellees contended successfully before, and are still contending, viz., that the use of the old bank's real estate to effect a tax saving for the new bank was not contemplated by the contract. In allowing these tax savings so far as Class C assets are concerned, and denying them as to Class B assets, the majority weaves a tangled web for itself and is evidently following the expert legal opinions of witnesses from the Comptroller's office, only one of whom was a lawyer, the others being laymen. No one denies that the legal title to all of the old bank's assets was transferred by the contract of December 3, 1932; but Article VI of the contract expressly provided for reconveyance of such assets to the old bank when the new bank had collected an amount sufficient to indemnify itself. From this and other provisions it is plain that the legal title acquired by the new bank was only that of a pledgee or mortgagee. This was expressly admitted by the appellant in its original answer, and was unanimously recognized by this court previously in both the majority and dissenting opinions.

The majority of the court as now constituted, consisting of the former dissenting judge and two additional judges who did not participate in this case on the former appeal, is rejecting the unanimous opinion of the court as originally constituted, which was that the new bank took the real estate and other B and C assets of the old bank as indemnification, and was merely a pledgee or trustee of the legal title to the assets in both classes. If the legal and equitable title had been vested in the new bank, as the court now holds, the new bank would have been absolutely obligated to pay the price of the assets so acquired, because it is elementary that there can be no sale involving the passage of legal title without a price, express or implied. If the new bank had been absolutely obligated for the price of these assets, the new bank would have been entitled to all proceeds of resale of those assets without the necessity of an accounting. No one ever contended for any of these results, and the holding of the majority seems to us to be wholly untenable for the reasons stated and for the further reason that the results are inconsistent with the new bank's right of substitution as between B and C assets, which would give a trustee the right to exchange trust property for his own as and when he saw fit. The right of a fiduciary to barter with himself for trust property ad libitum is something that no one should desire. It was not expressly stipulated in the contract, and no court should imply such a contractual abnormality. The new bank was only secondarily liable for the obligations assumed by it, and it held in pledge and antichresis real and personal property of a value far in excess of every obligation assumed by it. The common law does not recognize a pledge of real estate, but the civil law does, denominating it a contract of antichresis and defining it as a kind of pledge. Sec. 3134 of the Louisiana Civil Code. The excellent argument of appellees on this subject is unanswerably stated as follows:

"The contention of the new bank that it acquired title to Class B assets is also opposed to the provisions of the contract which give the new bank the right of substitution as between B and C assets. This right was frequently exercised and is completely inconsistent with any theory that either B or C assets were acquired in full ownership. If the real estate had belonged to the new bank, it would not have been entitled to charge the taxes paid on such real estate to the old bank, as it admittedly did. See, in addition to the answer above quoted, paragraph 6(B) of the stipulation signed by J. A. Walden, Cashier of the new bank, under date of April 4,

1941 (11, 571, 578; see also VII, 3313-4) which recites:

" 'The total amount of taxes paid by the new bank on real estate owned by the old bank and charged to its account, up to December 31, 1940, amounts to $161,642.78. Breakdown of amount to show total of payments for each year to be furnished.' " [20]

"The Comptroller's staff and counsel for the defendant contend that title to Class B assets 'must' have passed unconditionally to the new bank, because the Comptroller of the Currency permitted the new bank to show such assets in its statements. But the action of the Comptroller's office could certainly not bind the stockholders of the old bank. And apart from this, it is not correct to say, as counsel and the members of the Comptroller's staff contend, that the new bank would have been insolvent if it had not carried the B assets as belonging to it because it had assumed liabilities in a corresponding amount, since it is plain that the new bank was fully protected by a security title, and on cross-examination it was admitted that the position of the new bank was in substance the same as if it had held a note secured by mortgage and pledge of the old bank's assets."

This suit presents only questions of accounting between the trustee and the beneficiary of the trust estate. On December 3, 1932, although solvent as has been proven, the old bank transferred its entire assets to the new bank, and agreed to quit business, in consideration of the latter's assumption of the old bank's liabilities. Under the contract, there was to be no charge for assuming the obligations of the old bank or for administering the trust estate except as to Class C assets. There were to be reasonable fees and a pro rata of reasonable salaries, including expenses, for administering Class C assets. The residue of the assets was to be turned back to the old bank when the new bank had collected an amount sufficient to indemnify itself for the liabilities assumed. Evidently it was contemplated by the parties to this contract that large sums would be advanced by the pledgee to pay the assumed liabilities of the pledgor.

The contemporaneous construction of this contract by the parties soon after it was made shows indisputably that interest on assets was intended to be a charge for the use of money to be loaned and not as compensation for assuming liabilities or collecting rents and other revenues from Class B assets. This appears from an amendment to that portion of the contract on which the majority strongly relies for its contention that no capable banker or sensible business man would have agreed to administer Class B assets without a reasonable service charge for so doing. The fact is, however, that they did it because they contemplated the possibility of loans to the old bank in the amount of the liabilities assumed, and as these loans were expected to equal the book value of Class B assets, they made the contract for interest at the rate of six per cent per annum to be computed on the daily balances carried on the general ledger as Class B assets. That this provision was intended as compensation for the use of money to be loaned, in addition to the ordinary meaning of the word interest, is shown by the fact that paragraph V originally provided further that "in addition to interest and expenses as provided herein, party of second part shall charge to Class C assets or Class C Assets Account a reasonable fee for its services in administering Class B and Class C assets but any cash at any time in Class C Assets Account may, at the option of the party of the second part, be transferred to Class A assets and a like amount of Class B assets transferred to Class C assets."

"[20]. The total amount of taxes saved by the new bank by taking credit for the old bank's real estate is $191,778.55 (II, 578). The difference between the amount of taxes charged the old bank and the taxes saved by the new bank is due to the fact that the new bank's saving was, pursuant to the Louisiana statute, based upon the book value of the old bank's real estate and not upon the assessed value thereof."

From the above quoted provision, it is very clear that the new bank was to get interest on Class B assets at the rate of six per cent per annum as compensation for the use of money, whether loaned or not, and in addition was to be paid a reasonable fee for administering Class B assets. That was the original contract, and under it no one could claim that the word interest, as therein used, did not mean compensation for the use of money. Principal and interest are correlative terms like parent and child or husband and wife; the existence of one implies the existence of the other. Consequently no interest can accrue where no principal is owing; and a loan that provides for interest on the value of a pledged asset is usurious if the interest thus computed amounts to more than the legally permissible rate on the principal of the loan. Interest is not allowable on assumed liabilities when no money is lent nor on merely contemplated loans. No money was advanced to, or deposited to the credit of, the old bank except upon the collection of its revenues or the sale of its pledged assets. After the contract was signed, paragraph V was amended by agreement of the parties, not by correcting an error with reference to said interest charge, but by correcting an error with reference to the charge of a reasonable fee for the new bank's services in administering Class B assets; and it was expressly provided that the cost of administering Class B assets should fall entirely upon the new bank.

If thoughts are expressed in language, and language be made of words, where can words in any tongue be found to express more clearly the meeting of the minds of the parties to this contract on the point that the entire cost of administering Class B assets should fall upon the new bank? If no interest was due because no principal was owing (which is now conceded), and if no principal was owing because no money was lent (which is also belatedly conceded), what right has this court to reform the contract in accordance with its peculiar idea of what a capable banker or sensible business man would do? There may be the encroaching power to delete the word interest and to insert other words in lieu thereof, but there is no shadow of ambiguity in the pertinent words of the contract as to the intention of the parties. According to all the light that the context and contemporaneous circumstances afford, the parties meant for the new bank to bear the entire cost of administering Class B assets. The exact words are "that the costs of administering Class B assets falls entirely upon the party of the second part." To "fall upon" means for the party of the second part to bear the burden of such cost. Hence the consideration wholly failed for interest charges amounting to $1,311,364.64. This item being unlawful, the court is not at liberty to substitute a service charge for the same amount. Numerous Louisiana authorities will be cited later to support this statement of the law; but first let us consider the equity of the new bank's position and the merits of its claim for compensation.

The contentions of full ownership in the new bank of Class B assets and of the unique meaning of the word "interest" are demonstrable afterthoughts. Confronted with the realization that no money was lent and that the tax savings belonged to the old bank, appellant sought to amend its answer, but its petition to do so was denied. Thus the decision of the majority is in conflict with the answer of the new bank [6] as well as the contract, and much evidence in this huge record is outside the pleadings.

Nothing in the new record changes the fact that the organizers of the new bank put up only $140,000 in new money, and that they took out of the coffers of the old bank, on the day that it closed, all of the balance of the new bank's capital.

6. The following allegation was contained in the answer of the new bank filed on May 3, 1939: "Defendant [the new bank] denies the allegation that it became the owner of the property under contract of date December 3, 1932, or was primarily liable for the payment of taxes thereon, but it avers that the deed to said immovables having been executed as security only, all taxes paid thereon were properly chargeable by it to the old bank."

The stockholders of the new bank had a contingent liability, but this did not represent cash made available to depositors or creditors. The charge made by the new bank amounted to almost 14% of the Class B assets; [7] yet the new bank got, without any payment, all the benefits of a going concern and a large volume of deposits, which ordinarily it would take many years to acquire. The new bank paid no interest on ordinary deposits to offset that charged the old bank. During the first few years of its existence, in the depth of the depression, the new bank realized a profit of more than one hundred per cent upon its capital, mainly from the illegal interest charged the old bank.[8] It should require no argument to convince this court that over 100% of the entire income of property is more than a reasonable fee for administering assets. We agree with the court below in the following statement in its final opinion [72 F.Supp. 961, 977]: "It was hard for this court to understand the attitude of all the witnesses for the defendant with respect to the advantages accruing to the new bank from the fact that it took over a going concern, with conditions favorable to the rapid building of a substantial banking business, if the administration was successful. The possibility, if not the probability, of such a result has been thoroughly demonstrated in this case by the condition of the new bank, even at the end of 1936 or about four years, to say nothing of final liquidation, and the claims made here, which, if allowed, would exceed by several hundred thousand dollars its entire capital. This was accomplished in a period when many other banks in the country were passing dividends or earning much less than they did prior to the depression; so much so, that both the national

banking administration and those of the states permitted the making of charges for services that were either unknown or rarely used before. One of the great advantages which this bank and all others derived from this change of attitude of government, was to be relieved from the payment of interest on certain types of deposits, which had averaged some $200,000 a year to the old bank."

Since the new bank never made available any additional cash for the payment of deposits or other liabilities of the old bank except the $140,000 above mentioned, and never paid any of the liabilities of the old bank except out of the latter's assets as they were liquidated, and has failed to turn over to the old bank the residue of the trust estate in accordance with its contract (a tardiness and delinquency of more than ten years), it is unfair to a superlative degree to blame this litigation, or the appointment of a receiver, on the old bank, its stockholders committee, Mr. Moore (the new bank's whipping boy), or any one else except the new bank itself; and it is equally unfair to tax the appellees with any costs of court in this case. At the time of the appointment of the original receiver, February 21, 1936, the old bank was deemed to have only one creditor, namely, the new bank, which had assumed the obligations of the old bank. What a shame it was to force into receivership a solvent bank, which had quit business and turned over all of its assets to a solvent liquidating agent that had assumed all of its liabilities. "The receiver did little more than to stand by and give attention to what was going on", as Judge Dawkins said. A great deal was going on at the expense of the old bank. The pledgee continued to charge

7. The cost of liquidating all national banks (13 in number) having assets of from $12,000,000 to $18,000,000 placed in receivership in the period from Jan. 1, 1930, to Dec. 31, 1940, was 5.62%, which is less than one-half the cost of liquidating the old bank in this case, according to the records of the Comptroller's office.

8. For the period of six years from Jan. 1, 1933, to Dec. 31, 1938, when the liquidation was practically completed, the so-called compensation received by the new bank amounted to 130% of the new bank's capital (taking that capital for the full amount of $1,000,000, without regard to the fact that much of the cash constituting it was withdrawn from the old bank on the day that the latter closed).

The total income for this period realized by the old bank upon its pledged assets was less than the charges made by the new bank for its services.

six per cent interest on Class B assets until December 14, 1940. According to the calculations of the old bank, all assumed obligations had been paid by April 5, 1938, and the accounts between the two banks were balanced. Even according to the new bank's figures, we have a federal receiver and an agreed liquidator selected to handle the same assets from February 21, 1936, to December 14, 1940, a period of nearly five years , and this court is directing that Class C assets be charged with the enormous expense of both administrations. By letter of March 9, 1936, to the Comptroller, the new bank's president offered to purchase the assets of the old bank on a depreciated basis, accompanied by an assessment against the stockholders of the old bank probably for its psychological effect. This letter affords ample evidence as to the motivating causes that procured the receivership and as to the sinister methods that were devised to control it. It concludes as follows: "If you find that you cannot accept this offer, we recommend that the matter of assessment be delayed, as we believe that an assessment of any amount at this time would be unwise."

No good reason can be given for the appointment of a receiver in this case. The court below held that it was unnecessary, yet no one is questioning the validity of the appointment;[9] but the question is whether the new bank, for reasons of its own, requested the appointment and helped to cause it, thereby breaching its contract to assist in an orderly liquidation of the affairs of the old bank. This court is setting aside the finding of the district judge that the appointment of a receiver was unnecessary, but is making a finding of its own that in its legal implications is equally condemnatory of the new bank's trusteeship. Then it fails or refuses to visit upon the new bank the full legal consequences of its fiduciary delinquencies. The court holds that "the New Bank was one of the moving spirits, if not the moving spirit, in securing the appointment of a receiver", and that the action of the new bank in requesting the appointment "should be considered in the nature of an abandonment by the new bank of its contractual right and obligation to liquidate such [Class C] assets." This is a euphemistic way of saying that the new bank breached its contract to liquidate the assets of the old bank. One may abandon a right; but legal obligations must be fulfilled if the scales of justice are evenly balanced. The opinion admits the failure of the new bank to complete the liquidation according to contract, and admits "its request for the appointment of a receiver to do that which it had agreed to do"; but the Court recoils from a denial of the fabulous interest charges on imaginary loans, which enriched the pledgee, and on which this young giant fattened, during the lean years of the depression when other and older banks were struggling for existence.

If Justice wept when the law of the case was set aside with the speed of thought, she shrieked and swooned when the remainder of the decision was announced. It was all right, the court holds, for the officers and directors of the new bank to bid in at public sale the most valuable asset that the old bank owned, since the sale was approved by the court on petition of the receiver, and the purchasers paid $7 per share more than the next highest bidder. The short answer to this ruling is that the law did not permit the new bank to put itself in the position of a bidder so that its natural interest would be on the side of a low bid. If a trustee bids for trust property, he must do so for and on behalf of the trust estate. Neither a public sale nor an administrative order of court approving the sale can protect a trustee from being forced to disgorge profits so made. As stated by Mr. Justice Cardozo, a fiduciary may not perfect his claim to compensation by insisting that, although he had conflicting interests, he served his several masters equally well or that his primary loyalty was not weakened by the pull of his secondary one. "Only strict adherence to these equitable principles can keep the standard of conduct for fiduciaries 'at a level higher than that

9.  145 F.2d 192.

trodden by the crowd.' See Mr. Justice Cardozo in Meinhard v. Salmon, 249 N.Y. 458, 464, 164 N.E. 545, 546, 62 A.L.R. 1." Woods v. City National Bank & Trust Co., 312 U.S. 262, 61 S.Ct. 493, 497, 85 L.Ed. 820. See also Pepper v. Litton, 308 U.S. 295, at page 311, 60 S.Ct. 238, at page 247, 84 L.Ed. 281, wherein the court said: "He who is in such a fiduciary position cannot serve himself first and his cestuis second. * * * He cannot by the intervention of a corporate entity violate the ancient precept against serving two masters. * * * Where there is a violation of those principles, equity will undo the wrong or intervene to prevent its consummation." See also Crites, Inc., v. Prudential Ins. Co., 322 U.S. 408, 64 S.Ct. 1075, 88 L.Ed. 1356, and other cases cited by this court on the prior appeal.

It would be a pity for this court to lower the high standard of conduct set for fiduciaries from Biblical times to the time of Cardozo, and to this very day. A slap on the wrist is not enough for one who managed an estate so as to bring about the appointment of a receiver, who bought valuable trust property for his own benefit, and who tried to buy the residue at a price that would have caused great loss to the estate. The judgment of the lower court made an allowance to the new bank, not only of a half million dollars for compensation, but an allowance for expenses in the sum of $345,345.93. The majority opinion increases that compensation to $1,311,346.64, payable out of C assets for administering Class B assets. Class C assets belonged to the old bank; B assets belonged to the new bank, so this court holds. Therefore, the new bank is to be paid this enormous fee for looking after its own property, thereby creating an anomalous interest and a queer title whereby one person pays taxes on, and draws the revenue from, another's property. This is the natural consequence of such strained interpretation of a written instrument. Because the consideration failed for interest items charged against the old bank is no reason for departing from the other provisions of an unambiguous contract. When we say the old bank, we mean Class C assets, because that is all it has left, and out of that account must come all the costs, fees, expenses, and compensation assessed against the old bank. The residue will go to the latter's 270 shareholders,[10] if anything is left after ten years of litigation and seventeen years of liquidation.

There were only 15 shareholders in the new bank when it was organized. The directors and shareholders of the new bank were all directors, and in some instances officers, of the old bank. They were doubly bound to be scrupulously fair in managing the pledged assets: first, as officers and directors of the pledgor; second, as officers and directors of the pledgee.[11] There greater holdings in the new bank made their personal interests lie with it, and prohibited them from creating a conflict of interests between the two banks by purchasing or attempting to purchase the old bank's assets. These directors were the flesh and blood that animated the corporate pledgee, trustee, liquidator, and substitutor; and they were bound by every maxim and principle of equity that hedges a fiduciary and obliges him to refrain from attempting to serve two masters. They had the privilege to shift, exchange, and substitute the assets of the cestui que trust from Class B to Class C, and vice versa, as they saw fit, because the old bank was the equitable owner of each class of assets

10. The shareholders may be classified as follows:

    176 individuals held less than 25 shares each.
    48 Individuals held between 25 and 50 shares each.
    30 individuals held between 50 and 100 shares each.
    16 individuals held over 100 shares each.

    Included in the above calculation is Commercial National Company, Inc., a subsidiary of the old bank which itself held 350 shares of stock in the old bank.

11. Even Macbeth recognized his dual obligation to Duncan: "He is here in double trust; First, I am his kinsman and his subject, strong both against the deed; then, as his host, who should against his murderer shut the door, not bear the knife myself."

except Class A; but if, as the court now holds, the new bank was the legal and equitable owner of Class B assets, no man competent to be the trustee ever lived save One, and He was not a man. Realizing this, the contract provided that the privilege of such substitution and exchange should not extend to Class A assets.[12] It is necessary only to quote from the contract to prove that the equitable title to Class B assets was not intended to pass to the new bank. The last paragraph of part IV is as follows: "Party of the second part shall have the right and power of substitution and exchange between 'Class B' and 'Class C' assets so that if any of the assets now in 'Class B' are hereafter found to be unacceptable to party of the second part, then party of the second part shall have the right to take from 'Class C' assets any item or items or portions thereof, or cash derived therefrom, placing the same in 'Class B' assets substituting therefor the unacceptable item or items now or at any time hereafter in 'Class B' assets, and the right of substitution and exchange may be exercised at any time and from time to time, it being the intention and purpose of party of the first part to fully protect and indemnify party of the second part for the liability herein and hereby assumed, and this contract shall be liberally interpreted to that end."

Bankers handle the money of others, and they should be comparable in fidelity to the men of whom Calamandrei said: "In certain cities of the Netherlands the cutters of precious stones live in obscure little shops. All day they weigh on their scales jewels so rare that one alone would suffice to lift them forever from their poverty. But every evening when they have reconsigned these sparking gems to their eagerly awaiting owners, they appear serene, and on that same table where previously they had weighed another's treasure without sign of envy, they spread their frugal supper, and with the hands that had polished the diamonds of the rich they break the bread of their honest poverty."

The issue of the new bank's faithful stewardship, in relation to its claim for compensation for administering Class B assets, was not properly before the court below because, under the law of Louisiana, where there is a contract between the parties fixing or restricting the compensation, there can be no recovery on a quantum meruit. Morton v. Pollard, 9 La. 174; Mitchell v. Curell, 11 La. 252; Hogan v. Gibson, 12 La. 457; Willis v. Melville, 19 La.Ann. 13; Mazureau & Henen v. Morgan, 25 La.Ann. 281; Provost v. Carlin, 28 La.Ann. 595; Bright v. Metairie Cemetery Association, 33 La.Ann. 58; Condran v. City of New Orleans, 43 La.Ann. 1202, 9 So. 31; Dalgarn v. New Orleans Land Co., 162 La. 891, 111 So. 271; Land v. Acadian Production Corporation of Louisiana, D. C., 57 F.Supp. 338. In Mazureau & Henen v. Morgan, supra, the Supreme Court of Louisiana said: "But the plaintiffs contend that conceding the contract to be unlawful, they should recover on a quantum meruit. * * * But when the contract is proved, it is the law between the parties, and the parties must succeed or fail according to the terms of that contract—the court is not at liberty to substitute another, based upon the presumed assent of the parties."

This decision is binding in the federal court in an equity case. Guaranty Trust Co. v. York, 326 U.S. 99, 665 S.Ct. 1464, 89 L.Ed. 2079, 160 A.L.R. 1231.

As to appellant's compensation under Class C assets, we have already noted the duty of absolute fidelity that it owed to the trust estate, which prohibited it from creating any conflict of interest between itself and the old bank. The best that could be said for the new bank by a kindly court amounted to this: that its wrongful conduct grazed the edge of infidelity but did not constitute fraud. Such gentle blame has no deep root and serves no purpose of

---

12. See Contract, par. IV(a). This is a clear indication that the parties intended to make a distinction in the title between Class A and Class B assets, because if the new bank became the legal and equitable owner of both classes of assets, why could it not exchange and substitute its own property between the two classes as it saw fit?

deterrence. With reference to the stock of the Continental American Bank & Trust Co., the court below held that the conduct of appellant and its officers came [72 F. Supp. 972] "very close to bad faith", and "should be taken into consideration in fixing the amount of compensation." On this appeal, after letting appellant retain $1,-311,346.64 on the theory that the word interest as used by these bankers meant something other than compensation paid for the use or detention of money, this court says: "It is obvious that if the New Bank acted fraudulently in the handling of a Class B asset so as to impair its collectibility, any resort to Class C assets for indemnification would decrease the aggregate value of the Class C assets to be returned to the Old Bank." The court below in the same vein said, Vol. II, p. 130: "As to bad faith on the part of the defendant and its officials and agents, we start with the proposition that fraud is never presumed but the burden is upon the person claiming it both to allege and prove it by a preponderance of the evidence."

It was a clear-cut and prejudicial mistake of law to hold that it was necessary for the cestui que trust to prove fraud on the part of the pledgee. The rule requiring the utmost fidelity from a trustee, under pain of forfeiting compensation, is not limited to cases where the fiduciary is guilty of fraud or intentional misconduct. It applies to a case like this, where the fiduciary has put himself in a dual position so conflicting in its essence as to amount to a breach of loyalty to the cestui que trust. That it results in forfeiture of compensation is supported by many authorities, an excellent example of which is Woods v. City Nat. Bank & Trust Co., 312 U.S. 262, 61 S.Ct. 493, 497, 85 L.Ed. 820, wherein Mr. Justice Douglas, speaking for a unanimous court, said: "Reasonable compensation for services rendered may be allowed. The claimant, however, has the burden of proving their worth. Furthermore, 'reasonable compensation for services rendered' necessarily implies loyal and disinterested service in the interest of those for whom the claimant purported to act. American United Mutual Life Ins. Co. v. City of Avon Park, 311 U.S. 138, 61 S.Ct. 157, 85 L.Ed. 91 [136 A.L.R. 860] decided Nov. 25, 1940. Where a claimant, who represented members of the investing public, was serving more than one master or was subject to conflicting interests, he should be denied compensation. It is no answer to say that fraud or unfairness were not shown to have resulted. Cf. Jackson v. Smith, 254 U.S. 586, 589, 41 S.Ct. 200, 201, 65 L.Ed. 418. The principle enunciated by Chief Justice Taft * * * is apposite here: 'What is struck at in the refusal to enforce contracts of this kind is not only actual evil results but their tendency to evil in other cases.' Weil v. Neary, 278 U.S. 160, 173, 49 S.Ct. 144, 149, 73 L.Ed. 243. Furthermore, the incidence of a particular conflict of interest can seldom be measured with any degree of certainty. The bankruptcy court need not speculate as to whether the result of the conflict was to delay action where speed was essential, to close the record of past transactions where publicity and investigation were needed, to compromise claims by inattention where vigilant assertion was necessary, or otherwise to dilute the undivided loyalty owed to those whom the claimant purported to represent. Where an actual conflict of interest exists, no more need be shown in this type of case to support a denial of compensation."

Other authorities are cited in a note, but they are hardly necessary to support the sound principles announced above by the Supreme Court.[13]

13. In In re Republic Gas Corporation, D.C., 35 F.Supp. 300, 303, the court said: "Because of the inconsistent positions which are an unavoidable incident, it is a fraud in law for a trustee to purchase property which is the subject matter of his trust and the making of such a purchase is misconduct. Michoud v. Girod, 4 How. 503, 553, 554, 555, 557, 559, 11 L.Ed. 1076. See, also, Wormley v. Wormley, 8 Wheat. 421, 441, 5 L.Ed. 651; Hoyt v. Latham, 143 U.S. 553, 566, 12 S.Ct. 568, 36 L.Ed. 259; Cowee v. Cornell, 75 N.Y. 91, 100, 31 Am. Rep. 428; Pyle v. Pyle, 137 App.Div. 568, 572, 122 N.Y.S. 256, affirmed 199 N.Y. 538, 92 N.E. 1099.
* * * * * *

The opinion of the majority does not necessarily end this litigation, since there is no affirmance of a judgment on which execution may be issued, and the doctrine of the law of the case is a broken reed. This is a three to two decision; the prior decision was two to one. It has been over ten years since this suit was filed, over six years since the original judgment herein was entered in the district court, over five years since the former judgment was rendered in this court; and the size of the record has been increased from two volumes to fifteen, thirteen having been added during the interim between the two appeals to this court. The briefs have been lengthened in about the same proportion. All this time has been consumed in litigation over the alleged misconduct of a solvent trustee, and over the fees, charges, and expenses deducted by it from the multi-millions of assets entrusted to it as pledgee

and liquidator in December, 1932. One ground of reversal is that the court below allowed only 5% interest on Class B assets, when the contract called for 6%. The record does not show that any money was loaned, and the claim is that the word "interest" was a misnomer. Why the old bank is "held to the bond" as to the 6%, while the new bank is permitted to change the wording of it, is not perceived.

Those who disagree with the majority opinion may at least take comfort from its holding that the court may re-examine the questions here decided whenever it has the power and inclination to do so. While this doctrine may perplex the trial judge, it cannot fail to impress him with his duty and responsibility.

McCORD, Circuit Judge (concurring in the dissent).

"Irrespective of, and without disparagement of, the character of services they performed in the conduct of the debtor and the subsidiaries, by the course they adopted they assumed a place in the entire set-up which, as I think, necessarily carried with it an unqualified duty to avoid any attempt at personal gain by trading in the bonds. * * *

"It is insisted, particularly because the reorganization in the present instance is a success, that if the court feels compelled to frown on transactions such as those under review, it would be enough if from the fair value of the services of the committeemen there were a deduction of their gains from purchases and sales or from purchases where they still hold the bonds they bought (pp. 773, 774). As I see it, however, in circumstances like those in a reorganization, yielding to this insistence would result in a rule which, as a practical matter, would be unenforcible. Furthermore, if, as I deem it established, the misconduct amounts to a fraud in law, I conceive of no good reason why the penalty for the fraud should not be denial of any compensation whatever for those services. Indeed, I feel that the only available device for promoting, if not assuring, justice to depositing bondholders in the management of their affairs, and thus of restoring or attempting to restore faith in deposit agreements, is strict application to committeemen of the ancient equity rules governing the conduct of trustees, including deprivation of compensation where there is a departure from those rules."

In Haas v. McGinn, 1940, 64 R.I. 133, 11 A.2d 284, 287, the court, although conceding the trustee's honesty, said in denying the trustee compensation for his services: "It is infinitely better, even in exceptional cases of manifest hardship, that a trustee should suffer the results of his own errors and mistakes of judgment, than that the settled and established principles which have uniformly governed courts of equity in protecting the interests of the cestui que trust against the trustee should be relaxed or strained in the slightest degree for his acquittal or relief."